# Exhibit A

FILED
4/13/2023 4:08 PM
FELICIA PITRE
DISTRICT CLERK
DALLAS CO., TEXAS
Christi Underwood DEPUTY

Case 3:23-cv-00809-S   Document 1-1   Filed 04/17/23   Page 2 of 120   PageID 8

DC-23-04768

## CAUSE NO. _____

| | | |
|---|---|---|
| **WWEX FRANCHISE HOLDINGS, LLC,** | § | **IN THE DISTRICT COURT** |
| | § | |
| **Plaintiff,** | § | 191st |
| | § | |
| **vs.** | § | **___ TH JUDICIAL DISTRICT** |
| | § | |
| **CLINTON SQUADRONI,** | § | |
| | § | |
| **Defendant.** | § | **DALLAS COUNTY, TEXAS** |

**PLAINTIFF WWEX FRANCHISE HOLDINGS, LLC'S
ORIGINAL PETITION AND APPLICATION FOR TEMPORARY
RESTRAINING ORDER AND TEMPORARY INJUNCTION**

Plaintiff WWEX Franchise Holdings, LLC ("***Plaintiff***" or "***WWEX***") files its Original Petition and Application for Temporary Restraining Order and Temporary Injunction against Defendant Clinton Squadroni ("***Defendant***" or "***Squadroni***") and respectfully shows the Court the following:

### DISCOVERY CONTROL PLAN

1.      WWEX intends that discovery be conducted under Discovery Level 3.

### NATURE OF THE ACTION

2.      WWEX brings this action against Squadroni, a former highly compensated, senior-level executive, to prevent Squadroni's wrongful competition with WWEX in the course of his new employment with InXpress, LLC ("***InXpress***"), a direct competitor of WWEX.

3.      Squadroni resigned from WWEX on March 22, 2023, and he intends to work for InXpress as Global Chief Executive Officer. Doing so is a clear and willful breach of the non-competition agreement he voluntarily signed with WWEX.

4.      WWEX seeks to uphold Squadroni's contractual restrictive covenant obligations and to prevent Squadroni's unauthorized use and disclosure of WWEX's trade secrets and other confidential and proprietary information.

5.      WWEX seeks injunctive relief to stop Squadroni's ongoing and threatened breaches of his contractual and other legal obligations to WWEX. WWEX reserves the right to amend this Petition to assert additional claims against Squadroni or other parties as they might be discovered.

## PARTIES

6.      WWEX is a Delaware limited liability company with its principal place of business at 2700 Commerce Street, Dallas, Texas 75226.

7.      Squadroni is an individual who is a resident of the State of Indiana. Squadroni can be served with process at 1122 Aline Ct., South Bend, Indiana 46614.

## JURISDICTION

8.      This Court has jurisdiction over the lawsuit pursuant to Texas Business and Commerce Code § 15.51(a), and by Texas Civil Practices & Remedies Code §§ 65.011, 134A.003. WWEX's Application for Temporary Restraining Order and Temporary Injunction is further authorized by the agreements Squadroni executed with WWEX, in which he agreed that a "violation of any term of th[e] Agreement[s] will cause irreparable injury to [WWEX] for which no adequate remedy at law is available" and further "agree[d] that [WWEX], in addition to any other legal and equitable rights and remedies, will be entitled to the issuance of an order of specific performance and/or a temporary, preliminary or permanent injunctive relief, without bond, restraining any actual or threatened violation by [Squadroni] of any covenant in th[e] Agreement[s]." (*See* Confidentiality Agreement, Non-Solicitation Agreement, and Agreement Not

to Compete During Employment ("***Restrictive Covenants Agreement***") § 12; Post-Employment Non-Compete Agreement ("***PENCA***") § 6.)

9.     Additionally, the subject matter in controversy is within the jurisdictional limits of this court. WWEX seeks only nonmonetary relief.

10.     This Court has personal jurisdiction over Squadroni because the agreements at issue in this action were made and formed within the State of Texas and because Squadroni expressly consented in those agreements to the exercise of personal jurisdiction over him in and before Texas courts, and he can be served through the Texas Secretary of State, pursuant to Tex. Civ. Prac. & Rem. Code Sec. 17.044(b).

## VENUE

11.     Venue is proper in this Court because the forum selection clauses contained in the agreements at issue in this action provide for venue in courts in Dallas County, Texas.

## FACTS

**A.     WWEX's Business, Squadroni's Employment, and the Relevant Agreements**

12.     WWEX and its affiliated companies provide third-party logistics ("***3PL***") services and solutions to small and midsize business customers throughout the United States for their domestic and international shipping needs. WWEX is the largest-volume authorized reseller of UPS parcel shipping services. In addition to parcel shipping services, WWEX provides full-truckload ("***FTL***") and less-than-truckload ("***LTL***") freight shipping brokerage and reseller services for customers who do not have their own shipping logistics function.

13.     WWEX and its affiliated companies go to market directly through their own sales forces and indirectly through franchisees and independent sales agents. WWEX uses confidential and proprietary business plans and strategies to identify and service customers and to convince

customers to switch from their incumbent providers. WWEX's business plans and strategies have been highly successful, with more than 120,000 small and midsize business customers and more than 30 million shipments annually.

14.    From approximately April 18, 2017 through March 22, 2023, Squadroni was employed by WWEX as Director of Sales. For more than 10 years before starting that position, Squadroni worked in a position with similar responsibilities for one of the then-largest WWEX franchisees.

15.    During the time Squadroni worked for WWEX, he was employed as Director of Sales for the Ohio Valley District until early 2022. From February 2022 until his resignation, Squadroni ran and was primarily responsible for WWEX's Small Business Solutions ("***SBS***") program, a new, unique, and highly valuable go-to-market program for WWEX directed at specifically-targeted small business customers referred by UPS. In this position, Squadroni had nationwide responsibilities including responsibility for directing and managing a nationwide SBS sales force.

16.    In connection with Squadroni's employment with WWEX, on April 18, 2017, Squadroni also executed a Post-Employment Non-Compete Agreement ("***PENCA***"). A true and correct copy of the PENCA is attached as EXHIBIT A.

17.    In connection with Squadroni's employment with WWEX, on April 18, 2017, Squadroni executed a Confidentiality Agreement, Non-Solicitation Agreement, and Agreement Not to Compete During Employment ("***Restrictive Covenants Agreement***"). A true and correct copy of the Restrictive Covenant Agreement is attached as EXHIBIT B.

18.     WWEX has invested substantial time and resources in developing and acquiring proprietary, confidential, and competitively sensitive information and know-how for use in or for the benefit of WWEX's business.

19.     In connection with Squadroni's employment, WWEX provided Squadroni with "Confidential Information" related to all aspects of the business of WWEX so that he could most effectively perform his job duties. In various contracts Squadroni executed, he acknowledged the following definition of "Confidential Information":

> Confidential Information means the proprietary, confidential or competitively sensitive information that has been developed, obtained, or acquired by the Company and its affiliates for use in or for the benefit of the Business, including but not limited to, business plans and methods; contracts; databases; forms; know-how; knowledge; customer names, customer lists, customer contact information, and other customer information; prospective customer lists and information; information regarding the Company's and its affiliates' business relationship with UPS; information regarding the Company's and its affiliates' business relationships with franchisees, affiliates of franchisees, and regarding prospective franchisees; information regarding the Company's and its affiliates' business relationships with their suppliers, vendors, and subcontractors; information that you knew, or reasonably should have known, was not intended for disclosure to Worldwide Express franchisees; business strategies; marketing strategies; manuals; market research; sales, organizational, operational and/or marketing plans; methods; processes; records; specifications; standards; techniques; skillsets and compensation of other employees of the Company or its affiliates and of employees of franchisees; proprietary hardware and software systems; supply chain business methods; pricing information; profit margin information; the legal advice requested by or provided to the Company or its affiliates by either internal or external counsel; such other trade secret, proprietary, confidential or competitively sensitive information as may be periodically identified and treated by the Company and its affiliates as confidential; and any other information that gives the Company or its affiliates a competitive advantage.

(Ex A at 6; Ex. B at 7.)

20.     In the Restrictive Covenants Agreement and the PENCA, in exchange for employment by WWEX, the receipt of Confidential Information, and other consideration, Squadroni promised to preserve the confidentiality of WWEX's Confidential Information both

during and after employment. Squadroni further agreed to abide by certain limited non-compete and non-solicit restrictions after the termination of his employment.

21.     In the PENCA, Squadroni agreed not to compete with WWEX after his employment. Specifically, Section 2 of the PENCA states as follows:

<u>Covenants Not to Compete After Employment</u>. You acknowledge that certain methods of doing business and other elements comprising the Confidential Information of Company and the Worldwide Express System, as well as Worldwide Express customer, franchisee, vendor, carrier and employee relationships, are distinctive, commercially valuable and have been developed by Company and Worldwide Express at great effort, skill, time and expense; that you will have regular and continuing access to job-specific Confidential Information and valuable training regarding Company's business and Worldwide Express System and to such valuable relationships; that you have committed to preserve the confidentiality of the Confidential Information post-employment; and that you recognize your obligation to promote, develop, and protect the Company's business and the Worldwide Express System. You accordingly agree as follows:

(a)     For one (1) year after the later of: 1) termination of your employment with Company, regardless of the cause of termination (including, but not limited to, involuntary termination or your voluntary resignation), or 2) unless prohibited by applicable law, the date of final judgment or order of any court or tribunal that enforces the restrictions in this subsection, you will not, without the prior written consent of Company, directly or indirectly, for yourself, or through, on behalf of, or in conjunction with any other person or entity, own, operate, maintain, engage in, have any interest in, be employed by or perform any service relating to parcel, freight, or other shipping services, where your duties are in whole or in part are substantially similar to or overlap with your duties for Company, either within the United States or elsewhere if relating to products or services offered in the United States, for any business which offers services or products that are the same as or substantially similar to services or products that were offered by Company when you were employed by Company. The territorial limitations of the covenant not to compete are delineated more specifically in Section 2(b) below. The non-competition covenant in this Agreement will not apply to any ownership by you of less than a 5% beneficial interest in the outstanding equity securities of any publicly-held corporation.

(b)     Company and you agree that the Worldwide Express System has operations throughout the United States. To the extent your job description and job duties are national or broader in scope, you agree that the restrictions in Section 2(a) shall conform to the national scope of your duties. To the extent your job description and job duties are more local in scope, you agree that you shall be restricted from engaging in conduct proscribed by Section 2(a) within a radius of 100 miles from

your place of work for Company during the last twelve (12) months preceding the severance of your employment.

(c)     You acknowledge that Company may reduce the scope of any covenant or subpart in this Section 2 without your consent, effective immediately on written notice from Company, and you agree to comply promptly with any covenant or subpart so modified, which will be fully enforceable notwithstanding Section 10, or anything to the contrary in this Agreement. To the extent a court determines that any restriction set forth in this Section 2 is overbroad in any respect, the parties agree that the court shall modify such restriction and enforce it to the fullest extent the court deems reasonable.

(Ex. A § 2.)

22.     In the Restrictive Covenants Agreement, Squadroni agreed to keep confidential and not disclose WWEX's Confidential Information. Specifically, Sections 1 and 2 of the Restrictive Covenants Agreement state as follows:

During and forever after his or her employment by Company, Employee shall comply with the nondisclosure and other duties and restrictions related to Company's and its affiliates' Confidential Information as are described in Exhibit One. You shall be bound by the terms set forth in Exhibit One regardless of what terms appeared in the Handbook when you were hired.

During his or her employment with the Company, the Company shall provide Employee with access to selected Confidential Information necessary for the performance of Employee's duties. In return, Employee promises to preserve and protect the Confidential Information both during and after employment. Employee's obligation to preserve and protect includes a commitment not to misappropriate the Confidential Information for personal or third-party usage.

(Ex. B §§ 1-2.)

23.     In the Restrictive Covenants Agreement, Squadroni agreed not to solicit for a competing business certain of WWEX's customers, prospective customers, franchisees, prospective franchisees, carriers, or vendors and certain employees and independent contractors during his employment and for a limited period thereafter. Specifically, Sections 3 and 4 of the Restrictive Covenants Agreement state as follows:

During your employment with Company and for one (1) year after the later of: 1) termination of your employment with the Company, regardless of the cause of termination (including, but not limited to, involuntary termination or your voluntary resignation), or 2) unless prohibited by applicable law, the date of final judgment or order of any court or tribunal that enforces the restrictions in this subparagraph, you will not, directly or indirectly, for yourself, or through, on behalf of, or in conjunction with any person or entity, solicit, entice or persuade, or attempt to solicit, entice or persuade, any customer, prospective customer, franchisee, prospective franchisee, carrier, or vendor from doing business with the Company, its affiliates, or any WORLDWIDE EXPRESS franchisee or to divert or attempt to divert any business, customer, or prospective customer of the Company, its affiliates, or any WORLDWIDE EXPRESS franchisee to any competitor or other person by inducement or otherwise.

During your employment with the Company and for one (1) year after the later of: 1) termination of your employment with the Company, regardless of the cause of termination (including, but not limited to, involuntary termination or your voluntary resignation), or 2) unless prohibited by applicable law, the date of final judgment or order of any court or tribunal that enforces the restrictions in this subparagraph, you will not, without the prior written consent of the Company, directly or indirectly, for yourself, or through, on behalf of, or in conjunction with any person or entity, employ or engage as an independent contractor or seek to employ or engage as an independent contractor any person who, within the preceding 6 months, has been an employee or independent contractor of the Company, any of its affiliates, or any WORLDWIDE EXPRESS franchisee, or induce or seek to induce any person who is an employee or independent contractor of the Company, any affiliate of the Company, or any WORLDWIDE EXPRESS franchisee to leave his or her employment or terminate his or her independent contractor relationship.

(Ex. B §§ 3-4.)

24.    Squadroni agreed in the Restrictive Covenant Agreement that he "shall be restricted from engaging in conduct proscribed by Sections 3 through 5 anywhere within the United States or elsewhere if relating to products or services offered in the United States." (Ex. B § 8.)

25.    Squadroni also specifically agreed to not retain any Confidential Information after his employment terminated. (Ex. B § 7.)

**B.**     **Squadroni's Responsibilities as Director of Sales and Access to Confidential Information**

26.     Squadroni's position of Director of Sales is a senior-level position within WWEX's organization.

27.     For the majority of his employment at WWEX, Squadroni was Director of Sales over the Ohio Valley District, one of WWEX's nine sales districts, and, during approximately the last year prior to his resignation from WWEX, Squadroni served as Director of Sales over WWEX's new SBS program.

28.     As one of only 9 Directors of Sales overseeing sales districts within WWEX, Squadroni oversaw directly or indirectly more than 50 employees when he responsible for the Ohio Valley District. Subsequently, as Director of Sales over the SBS program, Squadroni oversaw directly or indirectly more than 200 employees. Squadroni reported to one of only three vice presidents of sales nationally for WWEX.

29.     In his capacities as Director of Sales over the Ohio Valley District and Director of Sales over the SBS program, Squadroni was responsible collectively for annual revenues of more than $150 million.

30.     As Director of Sales for the Ohio Valley District for WWEX, Squadroni was responsible for virtually all aspects of the business operations, strategy, and performance of his division. A Director of Sales acts as the CEO of his region and has the following responsibilities (among others):

- All hiring and termination decisions for their team, which includes a layer of leadership to manage each market, account executives, and account managers;

- Escalated customer issues and relationship building with key customers;

- Identifying 3rd party providers that can enhance capabilities, such as lead generation providers; and

- Working directly or through their team to coordinate with internal shared services capabilities to handle any situation that arises in their district, including:

  o HR: Any personnel, compensation, and benefits issues;

  o Legal: Any employee or customer related issues that may arise;

  o Revenue Operations: Running point on all customer issues, including but not limited to: collections, bad debt claims, customer credit limits, invoice disputes and resolution, and carrier payments;

  o Operations: Assisting with any customer issues and serving as the escalation point, including final say on how issues should be dealt with;

  o Finance: Working with finance to receive financial updates on the performance of their district, including but not limited to: customer retention detail, sales rep productivity, customer aging and bad debt, merchant service fees, payroll cost, T&E cost management, and discretionary spending;

  o Pricing: Working with dedicated pricing support to advance customer pricing and customer retention strategies;

  o Facilities: Working to ensure appropriate use of real estate or finding new offices if expansion is needed; and

  o Technology: Providing inputs on new capabilities and working with technology on customer integrations.

31. Due to the nature of their responsibilities, Directors of Sales are the only individuals in the sales organization that are paid based on P&L contribution versus a sales-driven metric. The importance of the Director of Sales position is reflected in the high compensation they are paid by WWEX. Squadroni was a highly compensated executive at WWEX, making hundreds of thousands of dollars per year.

32. Although Squadroni's title was Director of Sales (initially over WWEX's Ohio Valley District and then assuming oversight and responsibility over WWEX's national SBS program), his role always had a national scope. WWEX sales personnel are not restricted to a certain geographic area and are free to solicit customers and sell logistics services on a nationwide basis, regardless of the sales "District" in which they may be located. Indeed, employees under

Squadroni's management and responsibility serviced customers located in all 50 states and the District of Columbia.

33.     As a Director of Sales, Squadroni participated in regular meetings with other Directors of Sales and received confidential and proprietary information involving sales plans and strategies nationally. He participated in weekly meetings with other Directors of Sales at which new strategies and initiatives and new customers were discussed, and he regularly received production reports for every market. As recently as January 24, 2023, Squadroni hosted a SBS Sales Manager Kickoff meeting at WWEX's headquarters in Dallas, during which topics including the buildout of the program, production data, growth forecasts, and a go-to-market strategy were discussed.

34.     Additionally, Squadroni's role as head of WWEX's new SBS program also was national in scope and involved highly confidential and competitively sensitive information. The SBS program is a unique business relationship WWEX established with UPS in which UPS engaged WWEX to win back and increase market share of current and former small business customers versus competitors. At its peak, the SBS program engaged more than 5,000 newly activated customers on a weekly basis.

35.     Squadroni also had responsibility for and intimate knowledge of WWEX's involvement with UPS's Digital Access Program or "DAP" program. The DAP program is a global program UPS launched several years ago targeted at business-to-consumer shipments and particularly e-commerce shippers. WWEX's involvement in the UPS DAP program recently has been the fastest-growing sales program in the company.

36.     Although UPS offers the DAP program to multiple companies, the particular pricing and functionality WWEX offers to customers using the DAP program are unique and

proprietary and give WWEX a valuable advantage over its competitors. Squadroni has extensive knowledge of these proprietary aspects of WWEX's involvement in the DAP program.

## C.    The Non-Competition Covenant in the PENCA Is Reasonable and Necessary to Protect WWEX's Goodwill and Other Business Interests

37.    Considering Squadroni's high-level position within WWEX and access to competitively sensitive confidential business information and strategies, as described above, the limited non-competition restrictions set forth in the PENCA are reasonable and necessary to protect WWEX's goodwill and other business interests.

38.    Squadroni acknowledged this, as he specifically "agree[d] that the restrictions set forth in th[e PENCA] are reasonable and necessary to protect [WWEX's] legitimate business interests, including to protect [WWEX's] confidential information and relationships, to protect [WWEX] from unfair competition, and to prevent [WWEX's] valuable confidential information and know-how from being used unfairly against it, in light of the nature of [Squadroni's] responsibilities and duties." (Ex. A at 1.)

39.    Moreover, Squadroni has entered into other agreements with an affiliate of WWEX that contain post-employment non-competition covenants that are broader than the similar covenant in the PENCA, and Squadroni also acknowledged that these other non-competition restrictions were reasonable.

40.    Specifically, in connection with his receipt of substantial equity in Accord Topco LP ("***Accord Topco***"), WWEX's ultimate parent company, on July 26, 2021, Squadroni executed a Class B Unit Grant Agreement ("***Grant Agreement***") with Accord Topco. A true and correct copy of the Grant Agreement is attached as **EXHIBIT C**.

41.    In Section 6 of the Grant Agreement, Squadroni agreed to the following:

<u>Non-Competition</u>. Executive acknowledges that (i) Executive performs services of a unique nature for the Partnership and its Affiliates that are irreplaceable, and that Executive's performance of such services to a competing business will result in irreparable harm to the Partnership, (ii) Executive has had and will continue to have access to Confidential Information which, if disclosed, would unfairly and inappropriately assist in competition against the Partnership or any of its Affiliates, (iii) in the course of Executive's employment by a competitor, Executive would inevitably use or disclose such Confidential Information, (iv) the Partnership and its Affiliates have substantial relationships with their franchisees, distributors, brokers, carriers, clients, customers, suppliers and vendors, and Executive has had and will continue to have access to these franchisees, distributors, brokers, carriers, clients, customers, suppliers and vendors, (v) Executive has received and will receive specialized training from the Partnership and its Affiliates, and (vi) Executive has generated and will continue to generate goodwill for the Partnership and its Affiliates in the course of Executive's employment. Accordingly, during Executive's employment with the Partnership or any of its Affiliates and for a period of twelve (12) months thereafter, Executive agrees not to, on Executive's own behalf or on behalf of another Person (including as an employee, service provider, contractor, consultant, adviser, licensor, lessor, officer, director, equity holder, franchisor, franchisee, distributor, broker, carrier, member, partner, joint venture or investor of another Person), engage, invest or have any interest, either directly or indirectly, as a principal or for Executive's own account, or solely or jointly with others, or as an equity holder in any corporation or other entity, in any business in the United States of America that competes with the Partnership or any its Subsidiaries or any other business outside of the United States of America that competes with the Partnership or any of its Subsidiaries in the United States of America or any other jurisdiction in which the Partnership or any of its Subsidiaries conducts material business. Notwithstanding the foregoing, nothing herein shall prohibit Executive from being a passive owner of not more than one percent (1%) of the equity securities of a publicly traded corporation engaged in a business that is in competition with the Partnership or any of its Subsidiaries, so long as Executive has no active participation in the business of such corporation.

(Ex. C § 6(b).)

42.    In the Grant Agreement, Squadroni also expressly gave "assurance that [he] ha[d] carefully read and considered all of the terms and conditions of th[e] [Grant] Agreement . . . , including the restraints imposed under this Section 6." (Ex. C § 6(f).)

43.    Furthermore, Squadroni expressly "agree[d] that the[] restraints are necessary for the reasonable and proper protection of" WWEX, "that each and every one of the restraints is reasonable in respect of subject matter, length of time and geographic area," "that the[] restraints,

individually or in the aggregate, will not prevent [Squadroni] from obtaining other suitable employment during the period in which [he] is bound by the restraints[,]" and that he "has sufficient assets and skills to provide a livelihood while such covenants remain in force." (Ex. C § 6(f).)

44.     Considering Squadroni's repeated assurances and agreements as to the reasonableness of the more restrictive non-competition covenant in the Grant Agreement, to which Squadroni agreed in his capacity as a high-level "Executive" receiving substantial equity, the less restrictive non-competition covenant in the PENCA is particularly reasonable.

**D.      Squadroni's Resignation and Competitive Employment with InXpress**

45.     On March 22, 2023, Squadroni announced that he was resigning from WWEX, which was accepted that day.

46.     Prior to his resignation, Squadroni told multiple WWEX personnel that he was considering a job opportunity with InXpress. In one of those discussions, Joel Clum, WWEX's COO, specifically told Squadroni that WWEX would consider such employment by InXpress to be prohibited by the restrictive covenants in the agreements Squadroni had signed, and that WWEX would enforce those restrictive covenants to protect WWEX's business interests.

47.     On March 23, 2023, WWEX sent Squadroni a notice letter reminding him of his obligations under the PENCA and the Restrictive Covenants Agreement and demanding that he comply with such obligations, including, but not limited to, his obligation not to become employed by InXpress or another competitor and his obligation not to use WWEX's confidential, proprietary, and/or trade secret information for his benefit or the benefit of a competitor. A true and correct copy of WWEX's March 23, 2023 notice letter to Squadroni is attached as **EXHIBIT D**.

48.     Squadroni has not responded to WWEX's March 23, 2023 notice letter.

49.     WWEX discovered that after resigning from WWEX, Squadroni became employed by InXpress as Global Chief Executive Officer. Specifically, WWEX received correspondence from outside counsel for InXpress confirming that InXpress hired Squadroni as its Global CEO.

50.     InXpress is a 3PL reseller company which offers services that are the same as or substantially similar to the services WWEX offers and about which Squadroni has extensive confidential information from his employment by WWEX. In particular, InXpress resells UPS parcel shipping services and provides both FTL and LTL freight shipping services to small and midsize business customers. *See* InXpress Website Excerpts, attached as **Exhibit E**.

51.     InXpress' business model is also substantially similar to WWEX's business model. Like WWEX, InXpress is a 3PL logistics company that acts as an intermediary or reseller of shipping services to small and midsize businesses. Like WWEX, InXpress focuses on business customers that spend a relatively small amount on shipping each month and therefore do not have their own dedicated shipping or logistics function. Also like WWEX, InXpress goes to market through franchisees. In addition, InXpress has publicly stated that it is developing an internal sales team and capabilities to make direct sales, which makes InXpress' business model entirely overlapping with WWEX's business. InXpress resells the same kind of UPS parcel shipping services and maintains business relationships with many of the same FTL and LTL freight carriers as WWEX.

52.     Particularly concerning for WWEX, InXpress recently began a business relationship with UPS whereby it has become a reseller of UPS parcel shipping services in the United States. Domestic parcel shipping is a highly competitive market with substantial growth opportunities, and upon information and belief is a primary focus of InXpress' business strategy. InXpress' recent entry into this market as a UPS reseller puts it even more squarely in direct

competition with WWEX, and makes the confidential and proprietary information Squadroni knows from WWEX regarding its UPS relationship, programs, and business strategies even more valuable to a competitor like InXpress.

53.    InXpress has recently engaged in a targeted recruitment campaign to solicit and hire WWEX senior employees and sales personnel. For example, prior to InXpress hiring Squadroni, recruiters acting on behalf of InXpress contacted at least one other current WWEX senior executive and several former WWEX senior executive who are now franchisees regarding potentially filling the InXpress Global CEO role. These solicitations have been ongoing over at least the past year.

54.    InXpress is a direct competitor of WWEX.

55.    Squadroni's job functions as Global CEO of InXpress are substantially similar in whole or in part to and overlap with his duties for WWEX. For example, according to a Position Summary for the InXpress Global CEO position that a recruiter sent to another WWEX executive in January 2023, a copy of which is attached as **EXHIBIT F,** Squadroni has "profit-and-loss responsibility for the company, including overall commercial, operational and financial performance of the business," and he is responsible "for driving growth through the execution of a proven growth strategy within the transportation and logistics industry." (*See* Ex. F.)

56.    Specifically, according to the Position Summary, Squadroni has numerous Key Responsibilities as InXpress Global CEO that overlap with the responsibilities he had for WWEX, including, but not limited to, responsibilities relating to increasing growth, identifying opportunities for expansion, improving customer service operations, and integrating and capitalizing on new technology. (*See* Ex. F.)

57.     Moreover, the Position Summary includes among the Desired Outcomes of the InXpress Global CEO role "[s]trengthen[ing] internal sales team and capabilities to create an increased focus on direct sales, complementing InXpress' existing franchise business model." (*See* Ex. F.) This is the precise job function Squadroni performed for WWEX.

## CONDITIONS PRECEDENT

58.     WWEX complied or substantially complied with all of its duties under the Restrictive Covenants Agreement and the PENCA.

59.     All conditions precedent to WWEX bringing this action and WWEX's request for relief have been performed or have occurred.

## COUNT I
## BREACH OF CONTRACT: PENCA NON-COMPETITION COVENANT

60.     WWEX restates and incorporates herein by reference the allegations contained in Paragraphs 1 through 59.

61.     Pursuant to the PENCA he executed in connection with his employment with WWEX, Squadroni agreed that for a period of one (1) year following the termination of his employment with WWEX he would not, directly or indirectly, for himself, or through, on behalf of, or in conjunction with any other person or entity, own, operate, maintain, engage in, have any interest in, be employed by or perform any service relating to parcel, freight, or other shipping services, where his duties are in whole or in part are substantially similar to or overlap with his duties for WWEX, either within the United States or elsewhere if relating to products or services offered in the United States, for any business which offers services or products that are the same as or substantially similar to services or products that were offered by WWEX when he was employed by WWEX. (Ex. A § 2(a).)

62.     Because Squadroni's employment duties with WWEX were national in scope, Squadroni agreed not to engage in the proscribed conduct within an area conforming to the national scope of his duties. (Ex. A § 2(b).)

63.     Squadroni has breached his contractual non-competition obligations by, within one (1) year after the termination of his employment, becoming employed by InXpress, which is a business that offers services or products that are the same as or substantially similar to services or products that were offered by WWEX when Squadroni was employed by WWEX.

64.     Squadroni has also breached his contractual non-competition obligations by, within one (1) year after the termination of his employment, performing on behalf of InXpress the same or substantially similar shipping services and other duties that he performed while employed by WWEX.

65.     Squadroni's breach of the non-competition covenant in the PENCA has caused and is likely to continue to cause irreparable harm to WWEX for which it has no adequate remedy at law, including, but not limited to, the loss of valuable customer relationships and goodwill, and the loss of prospective customers and the unfair advantage created by a competitor's access to its highly effective internal business plans, partners, and confidential processes.

66.     Squadroni acknowledged in the PENCA that a "violation of any term of this Agreement will cause irreparable injury to [WWEX] for which now adequate remedy at law is available," and he "agree[d] that [WWEX], in addition to any other legal and equitable rights and remedies, will be entitled to the issuance of an order of specific performance and/or a temporary, preliminary or permanent injunctive relief, without bond, restraining any actual or threatened violation by [him] of any covenant in this Agreement." (Ex. A § 6.)

67.     Accordingly, WWEX is entitled to and requests injunctive relieve to enjoin Squadroni from continuing to breach the non-competition covenant in the PENCA.

## COUNT II
## BREACH OF CONTRACT: CONFIDENTIALITY & NON-DISCLOSURE COVENANT

68.     WWEX restates and incorporates herein by reference the allegations contained in Paragraphs 1 through 67.

69.     In the Restrictive Covenants Agreement, Squadroni agreed to preserve and protect the Confidential Information both during and after his employment and to not retain, in whole or in part, any copies of Confidential Information after his employment. (Ex. B §§ 1-2, 7.)

70.     Squadroni also agreed in the PENCA to preserve Confidential Information after his employment. (Ex. A at 1.)

71.     Upon information and belief, Squadroni has breached and/or threatens to breach his confidentiality and non-disclosure obligations by using Confidential Information, as defined in the Agreements, for unauthorized purposes after his employment, including competing with WWEX on behalf of InXpress.

72.     Squadroni's actual and/or threatened breach of his contractual confidentiality and non-disclosure obligations also has caused and is likely to continue to cause irreparable harm to WWEX for which it has no adequate remedy at law, including, but not limited to, the loss of Confidential Information, the loss of valuable customer relationships and goodwill, and the loss of prospective customers.

73.     Squadroni acknowledged in the Restrictive Covenants Agreement that a "violation of any term of this Agreement will cause irreparable injury to [WWEX] for which no adequate remedy at law is available," and he "agree[d] that [WWEX], in addition to any other legal and equitable rights and remedies, will be entitled to the issuance of an order of specific performance

and/or a temporary, preliminary or permanent injunctive relief, without bond, restraining any actual or threatened violation by [him] of any covenant in this Agreement." (Ex. B § 12.)

74.     Accordingly, WWEX is entitled to and requests injunctive relieve to enjoin Squadroni from continuing to breach his contractual confidentiality and non-disclosure obligations in the Restrictive Covenants Agreement and PENCA.

## COUNT III
## VIOLATION OF TEXAS UNIFORM TRADE SECRETS ACT

75.     WWEX restates and incorporates herein by reference the allegations contained in Paragraphs 1 through 74.

76.     The Confidential Information, including, but not limited to, WWEX's customer information, pricing information, personnel information, information regarding the SBS program, and information regarding WWEX's participation in the UPS DAP program, constitute trade secrets as defined in Texas Civil Practices & Remedies Code § 134A.002(6).

77.     The trade secrets give WWEX a substantial competitive advantage over its existing and would-be competitors, including InXpress, due to the significant investment of time, money, and resources that WWEX has invested and spent in developing them. These advantages would be lost if the trade secrets became known to the public or to WWEX's competitors, including InXpress.

78.     The trade secrets derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use. If Squadroni were to use or disclose the trade secrets for or on behalf of InXpress, which is arguably an inevitable outcome, he and InXpress would obtain a wrongful and unfair commercial advantage over WWEX in the very competitive marketplace in which these companies are direct competitors.

79.     WWEX uses efforts that are reasonable under the circumstances to maintain the secrecy of its trade secrets, including by requiring employees to enter into confidentiality agreements, limiting the disclosure of the information on a need-to-know basis, using sophisticated IT security protocols, policies, and procedures, and employing physical safeguards.

80.     Squadroni acquired WWEX's trade secrets under circumstances giving rise to a duty to maintain the trade secrets' secrecy and to limit the trade secrets' use. Squadroni also has a contractual duty under the Restrictive Covenants Agreement and the PENCA to maintain the secrecy of WWEX's trade secret information.

81.     Despite those obligations, Squadroni upon information and belief has knowingly misappropriated, used, and disclosed, and in any case threatens to misappropriate, use, and disclose, the trade secrets for the benefit of a competitor and for his own personal gain.

82.     Squadroni acquired WWEX's trade secrets by improper means, including by breach of a duty to maintain secrecy.

83.     Squadroni's actual and/or threatened misappropriation of WWEX's trade secrets was willful and malicious.

84.     WWEX has not consented, expressly or by implication, to Squadroni's continued possession or use of WWEX's trade secrets.

85.     Squadroni has been unjustly enriched by his misappropriation and use of WWEX's trade secrets.

86.     Squadroni's misconduct has caused, threatens to cause, and will continue to cause WWEX to suffer irreparable harm including, but not limited to, the loss of Confidential Information, the loss of valuable customer relationships and goodwill, and the loss of prospective customers.

87.     Accordingly, WWEX is entitled to and requests injunctive relieve to enjoin Squadroni from continuing to misappropriate and/or threatening to misappropriate WWEX's trade secrets.

## COUNT IV
## ATTORNEYS' FEES

88.     WWEX restates and incorporates herein by reference the allegations contained in Paragraphs 1 through 87.

89.     WWEX has been forced to incur, and will continue to incur, attorneys' fees and costs to enforce the contractual duties Squadroni owes to it under the Restrictive Covenants Agreement and the PENCA.

90.     WWEX is entitled to attorneys' fees under Tex. Bus. & Com. Code § 15.51(c) and Tex. Civ. Prac. & Rem. Code § 134A.005.

91.     WWEX is also entitled to recover its reasonable attorneys' fees, court costs, and reasonable out-of-pocket expenses related to the action based on the intent of the parties in entering into the Restrictive Covenants Agreement and the PENCA.

92.     Accordingly, pursuant to the Restrictive Covenants Agreement and the PENCA, Squadroni is additionally liable to WWEX in the amount of the reasonable value of WWEX's attorneys' fees in this action plus the amount of the costs and expenses that WWEX incurs in connection with this action.

93.     Additionally, because of Squadroni's wrongful conduct, it was necessary for WWEX to retain the legal services of the undersigned counsel, to protect WWEX's rights and prosecute this action.

94.     Therefore, to the extent permitted by law, WWEX seeks a recovery from Squadroni for its reasonable attorneys' fees and court costs.

## APPLICATION FOR
## TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION

95.     WWEX requests that the court issue a temporary restraining order and a temporary injunction against Squadroni to prevent imminent and irreparable harm to WWEX. In support of this application for TRO and temporary injunction, WWEX respectfully shows the Court as follows:

## GROUNDS FOR INJUNCTIVE RELIEF

96.     WWEX restates and incorporates herein by reference the allegations contained in Paragraphs 1 through 95. The Affidavit of Joel Clum in support of this application for temporary injunctive relief are attached and also incorporated herein by reference.

97.     Unless Squadroni is immediately enjoined and restrained, Squadroni will continue his wrongfully competitive employment with and on behalf of InXpress and will continue to disclose and misuse, and/or threaten to disclose and misuse, WWEX's Confidential Information and trade secrets.

98.     Temporary injunctive relief is authorized under Texas Civil Practices & Remedies Code §§ 65.011, 134A.003.

99.     Specifically, WWEX is entitled to an injunction because WWEX is entitled to the relief demanded in this application and all or part of that relief requires Squadroni to be restrained from the acts described above, which are prejudicial to WWEX.

100.    WWEX also is entitled to the injunctive relief sought herein because Squadroni consented to such relief in the agreements he signed with WWEX which form the basis for this action.

101.    Additionally, WWEX is entitled to an injunction under principles of equity, and Texas Civil Practices & Remedies Code § 134A.003 authorizes an injunction because Squadroni is actually misappropriating and/or threatening to misappropriate WWEX's trade secrets.

## **TEMPORARY INJUNCTION**

102.    WWEX restates and incorporates herein by reference the allegations contained in Paragraphs 1 through 101.

103.    As set forth more fully above, WWEX seeks relief for Squadroni's breach of his contractual non-competition obligations, for breach and/or threatened breach of his contractual confidentiality and non-disclosure obligations, and for misappropriation and/or threatened misappropriation of trade secrets.

104.    As shown above and in the Affidavit of Joel Clum, WWEX is likely to succeed on the merits of its claims at the trial of this matter.

105.    WWEX will suffer immediate and irreparable harm in the form of lost, but unquantifiable, business if Squadroni is not enjoined from the conduct described above. Such conduct is occurring now and threatens to continue, and the harm is immediate. The irreparable and immediate harm that WWEX will suffer is also the loss and permanent damage to its confidential and proprietary information, competitive advantages in the industry, its business relationships, WWEX's goodwill, and profitability.

106.    Squadroni agreed in the PENCA and the Restrictive Covenants Agreement "that [WWEX], in addition to any other legal and equitable rights and remedies, will be entitled to the issuance of an order of specific performance and/or a temporary, preliminary or permanent injunctive relief, without bond, restraining any actual or threatened violation by [him] of any covenant in th[e] Agreements." (Ex. A § 6; Ex. B § 12.)

107.     Additionally, unless Squadroni is immediately restrained, WWEX will continue to suffer the effects of Squadroni's wrongful conduct and improper use of WWEX's confidential, proprietary, and trade secret information for an undeterminable amount of time and extent, making the calculation of money damages difficult or impossible to ascertain. Thus, WWEX has no adequate remedy at law.

108.     WWEX therefore requests that the Court temporarily enjoin Squadroni from, pending final resolution at a trial on the merits of this action, directly or indirectly:

  a.  being employed by InXpress within the United States in the capacity of Global CEO or any other position for a period of one (1) year following the termination of his employment with WWEX, through March 22, 2024;

  b.  performing on behalf of InXpress anywhere within the United States the same or substantially similar shipping services and other duties that he performed while employed by WWEX for a period of one (1) year following the termination of his employment with WWEX;

  c.  competing unfairly with WWEX based in any way on his knowledge and/or use of the trade secrets and Confidential Information;

  d.  possessing, taking further, acquiring, disclosing, using in any way, otherwise misappropriating, or attempting to do any such thing with respect to, the Confidential Information and trade secrets;

  e.  soliciting, enticing, or persuading, or attempting to solicit, entice, or persuade, any customer, prospective customer, franchisee, prospective franchisee, carrier, or vendor from doing business with WWEX or its affiliates or franchisees, or diverting or attempting or attempting to divert any business, customer, or prospective

customer of WWEX or its affiliates or franchisees to any competitor or other person by inducement or otherwise, anywhere within the United States for a period of one (1) year following the termination of his employment with WWEX;

f.  employing or engaging as an independent contractor or seeking to employ or engage as an independent contractor any person who, within the preceding 6 months, has been an employee or independent contractor of WWEX or its affiliates of franchisees, or inducing or seeking to induce any person who is an employee or independent contractor of WWEX or its affiliates of franchisees to leave his or her employment or terminate his or her independent contractor relationship, anywhere within the United States for a period of one (1) year following the termination of his employment with WWEX; and

g.  destroying any documents, e-mails, storage devices, letters, correspondence, or other tangible items concerning Squadroni's dealings with and/or work on behalf of InXpress.

109.  Squadroni also should be required to comply with § 7 of his Restrictive Covenants Agreement and immediately return to WWEX all company devices, documents, electronically stored information, or other tangible property in his possession or under his control, and not retain any such materials, copies, extracts, or other reproductions.

## TEMPORARY RESTRAINING ORDER

110.  WWEX restates and incorporates herein by reference the allegations contained in Paragraphs 1 through 109.

111.  WWEX further requests that the Court issue a TRO immediately enjoining Squadroni from the acts described above to protect WWEX from the irreparable harm described

above and to maintain the status quo in the interim before the application for temporary injunction may be heard. As shown by the verified facts and attached affidavit, WWEX has satisfied all requirements for a TRO.

## REQUEST FOR HEARING

112.    WWEX requests the Court grant its application for TRO and further asks the Court to set its application for temporary injunction for a hearing within fourteen (14) days after the signing of the temporary restraining order and, after a hearing, issue a temporary injunction against Squadroni pending final resolution at a trial on the merits of this action.

## DEMAND FOR JURY TRIAL

113.    WWEX demands a jury trial under Texas Rule of Civil Procedure 216. WWEX is tendering the ten (10) dollar jury fee to the clerk of the court as required by TRCP 216.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff WWEX respectfully prays that this Court enter judgment in WWEX's favor, and against Defendant Squadroni, and award WWEX the following relief:

(a)    A temporary restraining order and temporary injunction prohibiting Defendant, for a period of one (1) year following the termination of his employment with WWEX, from breaching his non-competition covenant by being employed by InXpress within the United States in the capacity of Global CEO;

(b)    A temporary restraining order and temporary injunction prohibiting Defendant, for a period of one (1) year following the termination of his employment with WWEX, from breaching his non-competition covenant by performing on behalf of InXpress anywhere within the United States, the same or substantially similar shipping services and other duties that he performed while employed by WWEX;

(c)      A temporary restraining order and temporary injunction prohibiting Defendant from competing unfairly with WWEX based in any way on Defendant's knowledge and/or use of WWEX's trade secrets and Confidential Information;

(d)      A temporary restraining order and temporary injunction prohibiting Defendant from further taking, acquiring, disclosing, using in any way, otherwise misappropriating, or attempting to do any such thing with respect to, WWEX's trade secrets and Confidential Information;

(e)      A temporary restraining order and temporary injunction prohibiting Defendant, for a period of one (1) year following the termination of his employment with WWEX, from soliciting, enticing, or persuading, or attempting to solicit, entice, or persuade, any customer, prospective customer, franchisee, prospective franchisee, carrier, or vendor from doing business with WWEX or its affiliates or franchisees, or diverting or attempting or attempting to divert any business, customer, or prospective customer of WWEX or its affiliates or franchisees to any competitor or other person by inducement or otherwise, anywhere within the United States;

(f)      A temporary restraining order and temporary injunction prohibiting Defendant, for a period of one (1) year following the termination of his employment with WWEX, from employing or engaging as an independent contractor or seeking to employ or engage as an independent contractor any person who, within the preceding 6 months, has been an employee or independent contractor of WWEX or its affiliates of franchisees, or inducing or seeking to induce any person who is an employee or independent contractor of WWEX or its affiliates of franchisees to leave his or her employment or terminate his or her independent contractor relationship, anywhere within the United States;

(g)     A temporary restraining order and temporary injunction prohibiting Defendant from destroying any documents, e-mails, storage devices, letters, correspondence, or other tangible items concerning Squadroni's dealings with and/or work on behalf of InXpress;

(h)     A temporary restraining order and temporary injunction requiring Defendant to comply with § 7 of his Restrictive Covenants Agreement and immediately return to WWEX all company devices, documents, electronically stored information, or other tangible property in his possession or under his control, and not retain any such materials, copies, extracts, or other reproductions;

(i)     Reasonable attorneys' fees and costs incurred in this action pursuant to the terms of the Restrictive Covenants Agreement and the PENCA and pursuant to Texas Civil Practices & Remedies Code § 38.001, and other applicable law;

(j)     Pre-judgment and post-judgment interest;

(k)     Such other and further relief as the Court deems just and proper.

Dated: April 13, 2023                    Respectfully submitted,

By: */s/ Richard A. Sayles*
**RICHARD A. SAYLES**
Texas State Bar No. 17697500
dsayles@bradley.com
**DENNIS L. DANIELS JR.**
Texas State Bar No. 24107402
dldaniels@bradley.com
**LAUREN M. GREEN**
Texas State Bar No. 24114574
lagreen@bradley.com
BRADLEY ARANT BOULT CUMMINGS LLP
3600 Fountain Place
1445 Ross Avenue
Dallas, TX 75202
Tel: (214) 257-9800
Fax: (214) 939-8787

**RONALD T. COLEMAN**
*(pro hac vice forthcoming)*
rcoleman@phrd.com
**JOHN H. ELLIOTT**
*(pro hac vice forthcoming)*
jelliott@phrd.com
PARKER HUDSON RAINER & DOBBS
303 Peachtree Street NE,
Suite 3600
Atlanta, GA 30308
Tel: (404) 420-1144
Fax: (404) 522-8409

**ATTORNEYS FOR PLAINTIFF**

**CAUSE NO. _____**

| | | |
|---|---|---|
| **WWEX FRANCHISE HOLDINGS, LLC,** | § § § | **IN THE DISTRICT COURT** |
| **Plaintiff,** | § § | **__th JUDICIAL DISTRICT** |
| **vs.** | § § | |
| **CLINTON SQUADRONI,** | § § | **DALLAS COUNTY, TEXAS** |
| **Defendant.** | § | |

**AFFIDAVIT OF JOEL CLUM**

I, Joel Clum, after being duly sworn, state and depose as follows:

1.      I am employed by WWEX Franchise Holdings, LLC ("***WWEX***") as Chief Operating Officer ("***COO***"). I have been employed by WWEX since May 11, 2015, and I have held the COO position since 2016.

2.      WWEX and its affiliated companies provide third-party logistics ("***3PL***") services and solutions to small and midsize business customers throughout the United States for their domestic and international shipping needs. WWEX is the largest-volume authorized reseller of UPS parcel shipping services. In addition to parcel shipping services, WWEX provides full-truckload ("***FTL***") and less-than-truckload ("***LTL***") freight shipping brokerage and reseller services for customers who do not have their own shipping logistics function.

3.      WWEX's mission has always been to provide small to midsize companies with the scale and savings for their parcel and freight shipping afforded to larger enterprise businesses.

4.      WWEX and its affiliated companies go to market directly through their own sales forces and indirectly through franchisees and independent sales agents. WWEX uses confidential and proprietary business plans and strategies to identify and service customers and to convince customers to switch from their incumbent providers. WWEX's business plans and strategies have

A0FA8184-2749-4E15-A873-E54AF3511170 — 20230413 13:48:24 -6:00 — Remote Notary

been highly successful, with more than 120,000 small and midsize business customers and more than 30 million shipments annually.

5.      Clinton Squadroni worked for WWEX from April 2017 until he resigned on March 22, 2023. During that time, he was employed as Director of Sales for the Ohio Valley District until early 2022. From February 2022 until his resignation, Squadroni ran and was primarily responsible for WWEX's Small Business Solutions ("**SBS**") program, a new, unique, and highly valuable go-to-market program for WWEX directed at specifically-targeted small business customers referred by UPS. In this position, Squadroni had nationwide responsibilities including responsibility for directing and managing a nationwide SBS sales force.

6.      In connection with Squadroni's employment with WWEX, on April 18, 2017, Squadroni also executed a Post-Employment Non-Compete Agreement ("**PENCA**"). A true and correct copy of the PENCA is attached as **EXHIBIT A**.

7.      In connection with Squadroni's employment with WWEX, on April 18, 2017, Squadroni executed a Confidentiality Agreement, Non-Solicitation Agreement, and Agreement Not to Compete During Employment ("**Restrictive Covenants Agreement**"). A true and correct copy of the Restrictive Covenants Agreement is attached as **EXHIBIT B**.

8.      In connection with his receipt of substantial equity in Accord Topco LP ("**Accord Topco**"), WWEX's ultimate parent company, on July 26, 2021, Squadroni executed a Class B Unit Grant Agreement ("**Grant Agreement**") with Accord Topco. A true and correct copy of the Grant Agreement is attached as **EXHIBIT C**.

9.      For the majority of his employment at WWEX, Squadroni was Director of Sales over the Ohio Valley District, one of WWEX's nine sales districts, and, during approximately the

DocVerify ID: A0FA8184-2749-4E15-A873-E54AF3511170
www.docverify.com                                                                          Page 2 of 10        2E54AF3511170

A0FA8184-2749-4E15-A873-E54AF3511170 — 20230413 13:48:24 -6:00 — Remote Notary

last year prior to his resignation from WWEX, Squadroni served as Director of Sales over WWEX's new SBS program.

10.     As one of only 9 Directors of Sales overseeing sales districts within WWEX, Squadroni oversaw directly or indirectly more than 50 employees when he responsible for the Ohio Valley District. Subsequently, as Director of Sales over the SBS program, Squadroni oversaw directly or indirectly more than 200 employees. Squadroni reported to one of only three vice presidents of sales nationally for WWEX.

11.     In his capacities as Director of Sales over the Ohio Valley District and Director of Sales over the SBS program, Squadroni was responsible collectively for annual revenues of more than $150 million.

12.     As Director of Sales for the Ohio Valley District for WWEX, Squadroni was responsible for virtually all aspects of the business operations, strategy, and performance of his division. A Director of Sales acts as the CEO of his region and has the following responsibilities (among others):

- All hiring and termination decisions for their team, which includes a layer of leadership to manage each market, account executives, and account managers;

- Escalated customer issues and relationship building with key customers;

- Identifying 3rd party providers that can enhance capabilities, such as lead generation providers; and

- Working directly or through their team to coordinate with internal shared services capabilities to handle any situation that arises in their district, including:

  - HR: Any personnel, compensation, and benefits issues;

  - Legal: Any employee or customer related issues that may arise;

  - Revenue Operations: Running point on all customer issues, including but not limited to: collections, bad debt claims, customer credit limits, invoice disputes and resolution, and carrier payments;

o   Operations: Assisting with any customer issues and serving as the escalation point, including final say on how issues should be dealt with;

o   Finance: Working with finance to receive financial updates on the performance of their district, including but not limited to: customer retention detail, sales rep productivity, customer aging and bad debt, merchant service fees, payroll cost, T&E cost management, and discretionary spending;

o   Pricing: Working with dedicated pricing support to advance customer pricing and customer retention strategies;

o   Facilities: Working to ensure appropriate use of real estate or finding new offices if expansion is needed; and

o   Technology: Providing inputs on new capabilities and working with technology on customer integrations.

13.     Due to the nature of their responsibilities, Directors of Sales are the only individuals in the sales organization that are paid based on P&L contribution versus a sales-driven metric. The importance of the Director of Sales position is reflected in the high compensation they are paid by WWEX. Squadroni was a highly compensated executive at WWEX who was paid hundreds of thousands of dollars per year.

14.     Although Squadroni's title was Director of Sales (initially over WWEX's Ohio Valley District and then assuming oversight and responsibility over WWEX's national SBS program), his role always had a national scope. WWEX sales personnel are not restricted to a certain geographic area and are free to solicit customers and sell logistics services on a nationwide basis, regardless of the sales "District" in which they may be located.

15.     As a Director of Sales, Squadroni participated in regular meetings with other Directors of Sales and received confidential and proprietary information involving sales plans and strategies nationally. He participated in weekly meetings with other Directors of Sales at which new strategies and initiatives and new customers were discussed, and he regularly received production reports for every market. As recently as January 24, 2023, Squadroni hosted a SBS

DocVerify ID: A0FA8184-2749-4E15-A873-E54AF3511170
www.docverify.com

Page 4 of 10     4E54AF3511170

A0FA8184-2749-4E15-A873-E54AF3511170 — 2023/04/13 13:48:24 -6:00 — Remote Notary

Sales Manager Kickoff meeting at WWEX's headquarters in Dallas, during which topics including the buildout of the program, production data, growth forecasts, and a go-to-market strategy were discussed.

16.     Additionally, Squadroni's role as head of WWEX's new SBS program also was national in scope and involved highly confidential and competitively sensitive information. The SBS program is a unique business relationship WWEX established with UPS in which UPS engaged WWEX to win back and increase market share of current and former small business customers versus competitors. At its peak, the SBS program engaged more than 5,000 newly activated customers on a weekly basis.

17.     Squadroni also had responsibility for and intimate knowledge of WWEX's involvement with UPS's Digital Access Program or "DAP" program. The DAP program is a global program UPS launched several years ago targeted at business-to-consumer shipments and particularly e-commerce shippers. WWEX's involvement in the UPS DAP program recently has been the fastest-growing sales program in the company.

18.     Although UPS offers the DAP program to multiple companies, the particular pricing and functionality WWEX offers to customers using the DAP program are unique and proprietary and give WWEX a valuable advantage over its competitors. Squadroni has extensive knowledge of these proprietary aspects of WWEX's involvement in the DAP program.

19.     On March 22, 2023, Squadroni informed me that he was resigning from WWEX. I accepted his resignation effective immediately.

20.     Prior to his resignation, Squadroni told me and other WWEX personnel that he was considering a job opportunity with InXpress. I told Squadroni that WWEX would consider such employment by InXpress to be prohibited by the restrictive covenants in the agreements Squadroni

DocVerify ID: A0FA8184-2749-4E15-A873-E54AF3511170
www.docverify.com

A0FA8184-2749-4E15-A873-E54AF3511170 — 20230413 13:48:24 -6:00 — Remote Notary

had signed, and that WWEX would enforce those restrictive covenants to protect WWEX's business interests.

21.     On March 23, 2023, WWEX sent Squadroni a notice letter reminding him of his obligations under the PENCA and the Restrictive Covenants Agreement and demanding that he comply with such obligations, including, but not limited to, his obligation not to become employed by InXpress or another competitor and his obligation not to use WWEX's confidential, proprietary, and/or trade secret information for his benefit or the benefit of a competitor. A true and correct copy of WWEX's March 23, 2023 notice letter to Squadroni is attached as **EXHIBIT D**.

22.     Squadroni has not responded to WWEX's March 23, 2023 notice letter.

23.     After resigning from WWEX, I understand that Squadroni became employed by InXpress, LLC ("InXpress") as Global Chief Executive Officer. Specifically, I have seen correspondence from outside counsel for InXpress confirming that InXpress hired Squadroni as its Global CEO.

24.     InXpress is a 3PL reseller company which offers services that are the same as or substantially similar to the services WWEX offers and about which Squadroni has extensive confidential information from his employment by WWEX. In particular, InXpress resells UPS parcel shipping services and provides both FTL and LTL freight shipping services to small and midsize business customers. *See* InXpress Website Excerpts, attached as **EXHIBIT E**.

25.     InXpress' business model is also substantially similar to WWEX's business model. Like WWEX, InXpress is a 3PL logistics company that acts as an intermediary or reseller of shipping services to small and midsize businesses. Like WWEX, InXpress focuses on business customers that spend a relatively small amount on shipping each month and therefore do not have their own dedicated shipping or logistics function. Also like WWEX, InXpress goes to market

through franchisees. In addition, InXpress has publicly stated that it is developing an internal sales team and capabilities to make direct sales, which makes InXpress' business model entirely overlapping with WWEX's business. InXpress resells the same kind of UPS parcel shipping services and maintains business relationships with many of the same FTL and LTL freight carriers as WWEX.

26.     Particularly concerning for WWEX, InXpress recently began a business relationship with UPS whereby it has become a reseller of UPS parcel shipping services in the United States. Domestic parcel shipping is a highly competitive market with substantial growth opportunities. InXpress' recent entry into this market as a UPS reseller puts it even more squarely in direct competition with WWEX, and makes the confidential and proprietary information Squadroni knows from WWEX regarding its UPS relationship, programs, and business strategies even more valuable to a competitor like InXpress.

27.     InXpress has recently engaged in a targeted recruitment campaign to solicit and hire WWEX senior employees and sales personnel. For example, prior to InXpress hiring Squadroni, recruiters acting on behalf of InXpress contacted at least one other current WWEX senior executive and several former WWEX senior executive who are now franchisees regarding potentially filling the InXpress Global CEO role. These solicitations have been ongoing over at least the past year.

28.     InXpress is a direct competitor of WWEX.

29.     I have seen a description of the job responsibilities for the position of Global CEO of InXpress, a copy of which is attached as **EXHIBIT F**. The job responsibilities as Global CEO of InXpress are substantially similar in whole or in part to and overlap with his duties for WWEX. For example, according to the Position Summary for the InXpress Global CEO position, Squadroni

A0FA8184-2749-4E15-A873-E54AF3511170 — 2023/04/13 13:48:24 -6:00 — Remote Notary

DocVerify ID: A0FA8184-2749-4E15-A873-E54AF3511170
www.docverify.com
Page 7 of 10       7E54AF3511170

has "profit-and-loss responsibility for the company, including overall commercial, operational and financial performance of the business," and he is responsible "for driving growth through the execution of a proven growth strategy within the transportation and logistics industry." (*See* Ex. F.)

30.     Specifically, according to the Position Summary, Squadroni has numerous Key Responsibilities as InXpress Global CEO that overlap with the responsibilities he had for WWEX, including, but not limited to, responsibilities relating to increasing growth, identifying opportunities for expansion, improving customer service operations, and integrating and capitalizing on new technology. (*See* Ex. F.)

31.     Moreover, the Position Summary includes among the Desired Outcomes of the InXpress Global CEO role "[s]trengthen[ing] internal sales team and capabilities to create an increased focus on direct sales, complementing InXpress' existing franchise business model." (*See* Ex. F.) This is the precise job function Squadroni performed for WWEX.

32.     WWEX has invested substantial time and resources in developing and acquiring proprietary, confidential, and competitively sensitive information and know-how for use in or for the benefit of WWEX's business. In connection with Squadroni's employment, WWEX provided Squadroni with "Confidential Information" (as defined in his employment agreements and Grant Agreement) relating to all aspects of the business of WWEX so that he could most effectively performance of his job duties. WWEX's confidential information and trade secrets include without limitation its customer information, pricing information, personnel information, information regarding the SBS program, and information regarding WWEX's participation in the UPS DAP program.

8

33.     WWEX's confidential information and trade secrets give WWEX a substantial competitive advantage over its existing and would-be competitors, including InXpress, due to the significant investment of time, money, and resources that WWEX has invested and spent in developing them. These advantages would be lost if the trade secrets became known to the public or to WWEX's competitors, including InXpress.

34.     The trade secrets derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means, by other persons who can obtain economic value from its disclosure or use. If Squadroni were to use or disclose the trade secrets for or on behalf of InXpress, he and InXpress would obtain a wrongful and unfair commercial advantage over WWEX in the very competitive marketplace in which these companies are direct competitors.

35.     WWEX uses efforts that are reasonable under the circumstances to maintain the secrecy of its trade secrets, including by requiring employees to enter into confidentiality agreements, limiting the disclosure of the information on a need-to-know basis, using security protocols, policies, and procedures, and employing physical safeguards.

36.     In his employment by InXpress as Global CEO, Squadroni threatens to misappropriate, use, or disclose WWEX's confidential information and trade secrets for the benefit of a competitor and for his own personal gain. His use or disclosure of WWEX's trade secrets would give InXpress an unfair competitive advantage and harm WWEX in ways that would be difficult to quantify, including by the possible loss of customer business and goodwill, loss of market share, erosion of profit margins on certain kinds of business or with certain customers, and other types of unfair competition.

A0FA8184-2749-4E15-A873-E54AF3511170 — 20230413 13:48:24 -6:00 — Remote Notary

DocVerify ID: A0FA8184-2749-4E15-A873-E54AF3511170
www.docverify.com

Page 9 of 10     9E54AF3511170

Executed on the 13th day of April, 2023.

*Joel Clum*

Joel Clum

Sworn to and subscribed
Before me this 13th day of April, 2023.
This notarial act was performed as a
Remote Online Notarization.



_____
Notary Public in and for
The State of Texas

Notarial act performed by audio-visual communication

**Donna Keaton**
**Commission # 750927-0**
Notary Public
STATE OF TEXAS
My Comm Exp. Jun 25, 2026

DocVerify ID: A0FA8184-2749-4E15-A873-E54AF3511170
www.docverify.com

A0FA8184-2749-4E15-A873-E54AF3511170 --- 2023/04/13 13:48:24 -6:00 --- Remote Notary

Page 10 of 10     10E54AF3511170



**WWEX Squadroni - Affidavit of Joel Clum 4-13-23.pdf**

| | |
|---|---|
| DocVerify ID: | A0FA8184-2749-4E15-A873-E54AF3511170 |
| Created: | April 13, 2023 13:48:24 -6:00 |
| Pages: | 10 |
| Remote Notary: | Yes / State: TX |

This document is a DocVerify VeriVaulted protected version of the document named above. It was created by a notary or on the behalf of a notary, and it is also a DocVerify E-Sign document, which means the document was created for the purposes of Electronic Signatures and/or Electronic Notary. Tampered or altered documents can be easily verified and validated with the DocVerify veriCheck system. This remote online notarization involved the use of communication technology.

Go to www.docverify.com at any time to verify or validate the authenticity and integrity of this or any other DocVerify VeriVaulted document.

**E-Signature Summary**

**E-Signature 1: Joel Clum (JC)**
April 13, 2023 14:00:01 -6:00 [DD0553883BE2] [104.28.96.43]
Joel.clum@wwex.com (Principal) (Personally Known)

**E-Signature Notary: Donna Keaton (DKK)**
April 13, 2023 14:00:01 -6:00 [1A87091E59C1] [38.142.28.234]
legalmagnolia@yahoo.com
I, Donna Keaton, did witness the participants named above electronically
sign this document.



DocVerify documents cannot be altered or tampered with in any way once they are protected by the DocVerify VeriVault System. Best viewed with Adobe Reader or Adobe Acrobat.
All visible electronic signatures contained in this document are symbolic representations of the persons signature, and not intended to be an accurate depiction of the persons actual signature as defined by various Acts and/or Laws.



# EXHIBIT A

## POST-EMPLOYMENT NON-COMPETITION AGREEMENT

This Post-Employment Non-Competition Agreement ("Agreement") is entered into by and between WWEX Franchise Holdings, LLC, a Delaware limited liability company, and its predecessors, successors, subsidiaries and other affiliates ("Company") and the employee whose name is set forth in the signature area below ("Employee" or, as applicable, "you" or "your"). This Agreement shall be effective on the date counter-signed below by the Company (the "Effective Date"). Nothing in this Agreement changes the "at will" nature of the employment relationship between you and the Company, meaning that either you or the Company can terminate your employment at any time and for any reason or no reason.

## RECITALS

WHEREAS, Company provides certain Worldwide Express services throughout the United States including domestic and international small parcel, freight and other shipping services using the Worldwide Express System (the "Business"); and

WHEREAS, Company desires to employ you or continue to employ you, as applicable; you desire to be employed or continue to be employed by Company; and Company has entrusted, or is committed to entrust you with Confidential Information (as the term "Confidential Information" is defined in the Employee Handbook and is additionally defined in Attachment 1 hereto) related to the performance of your job duties, as well as valuable business relationships with customers, franchisees, vendors, carriers, and employees of Company's business; and

WHEREAS, in return for entrustment with Company's Confidential Information, you hereby covenant to preserve the confidentiality of Confidential Information post-employment; and

WHEREAS, you acknowledge that Company and its affiliates have invested substantial time and resources in developing, obtaining, and acquiring proprietary, confidential, and competitively sensitive information and know-how for use in or for the benefit of Company's business; and

WHEREAS, the parties hereto desire to ensure the protection of the confidential information and relationships of Company and Worldwide Express, which is necessary and a requirement for Company to employ and to continue to employ you; and

WHEREAS, the parties hereto agree that the restrictions set forth in this Agreement are reasonable and necessary to protect Company's legitimate business interests, including to protect Company's confidential information and relationships, to protect Company from unfair competition, and to prevent Company's valuable confidential information and know-how from being used unfairly against it, in light of the nature of your responsibilities and duties.

NOW THEREFORE, in consideration of the recitals above and the terms below, and for other good and valuable consideration, the receipt of which is acknowledged by the parties, Company and you agree:

1.      <u>Consideration.</u>  In consideration for your obligations in this Agreement, Company commits to providing you with eight (8) additional hours of PTO on the next payroll date following your execution of this Agreement.

Initials:    Employee    Company

- 1 -

2.     Covenants Not to Compete After Employment. You acknowledge that certain methods of doing business and other elements comprising the Confidential Information of Company and the Worldwide Express System, as well as Worldwide Express customer, franchisee, vendor, carrier and employee relationships, are distinctive, commercially valuable and have been developed by Company and Worldwide Express at great effort, skill, time and expense; that you will have regular and continuing access to job-specific Confidential Information and valuable training regarding Company's business and Worldwide Express System and to such valuable relationships; that you have committed to preserve the confidentiality of the Confidential Information post-employment; and that you recognize your obligation to promote, develop, and protect the Company's business and the Worldwide Express System. You accordingly agree as follows:

(a)     For one (1) year after the later of: 1) termination of your employment with Company, regardless of the cause of termination (including, but not limited to, involuntary termination or your voluntary resignation), or 2) unless prohibited by applicable law, the date of final judgment or order of any court or tribunal that enforces the restrictions in this subsection, you will not, without the prior written consent of Company, directly or indirectly, for yourself, or through, on behalf of, or in conjunction with any other person or entity, own, operate, maintain, engage in, have any interest in, be employed by or perform any service relating to parcel, freight, or other shipping services, where your duties are in whole or in part are substantially similar to or overlap with your duties for Company, either within the United States or elsewhere if relating to products or services offered in the United States, for any business which offers services or products that are the same as or substantially similar to services or products that were offered by Company when you were employed by Company.   The territorial limitations of the covenant not to compete are delineated more specifically in Section 2(b) below.  The non-competition covenant in this Agreement will not apply to any ownership by you of less than a 5% beneficial interest in the outstanding equity securities of any publicly-held corporation.

(b)     Company and you agree that the Worldwide Express System has operations throughout the United States.  To the extent your job description and job duties are national or broader in scope, you agree that the restrictions in Section 2(a) shall conform to the national scope of your duties.  To the extent your job description and job duties are more local in scope, you agree that you shall be restricted from engaging in conduct proscribed by Section 2(a) within a radius of 100 miles from your place of work for Company during the last twelve (12) months preceding the severance of your employment.

(c)     You acknowledge that Company may reduce the scope of any covenant or subpart in this Section 2 without your consent, effective immediately on written notice from Company, and you agree to comply promptly with any covenant or subpart so modified, which will be fully enforceable notwithstanding Section 10, or anything to the contrary in this Agreement.  To the extent a court determines that any restriction set forth in this Section 2 is overbroad in any respect, the parties agree that the court shall modify such restriction and enforce it to the fullest extent the court deems reasonable.

3.     Covenants Are Conditions Precedent to Employment or Continued Employment. The covenants by you in this Agreement are conditions precedent to employment or continued employment by Company. Any claim or cause of action against Company, whether arising in relation to this Agreement, the Company's business or otherwise, will not be a defense to the enforcement by Company of any covenant in this Agreement.

Employee     Company

Initials:

- 2 -

DocuSign Envelope ID: FCB1BC49-C6B6-486F-B355-872E210AE4B4

4.      <u>Compliance with Specific State and Provincial Laws</u>.  Company seeks only to create reasonable restrictions for employment <u>that are consistent with state and provincial law</u>.  Some states (for example, California, Oklahoma, and North Dakota) do not permit the creation of post-employment restrictive covenants.  Accordingly, for these jurisdictions where the provisions of Section 2 are expressly prohibited by applicable law (as opposed to a jurisdiction that would "blue pencil" or reform an overly broad but otherwise enforceable provision), such provisions that violate state or provincial law shall be deemed omitted and/or excised from this Agreement.  However, should you relocate during the twelve (12) months following employment with Company to a state or province where such post-employment restrictions are not prohibited, Company and you agree that the provisions of Section 2 shall be given force and effect to the maximum reasonable extent permitted by your new state or provincial residence.

5.      <u>Severability</u>. Each covenant and subpart of a covenant in this Agreement is independent of each other covenant and subpart of a covenant of this Agreement. If a portion of a covenant or subpart in this Agreement is held invalid or unenforceable by a court or tribunal, you agree to be bound by any lesser covenant or subpart subsumed within the terms of the covenant or subpart that imposes the maximum duty permitted by law, as if the resulting covenant or subpart were separately stated in this Agreement. If an entire covenant in this Agreement is held invalid or unenforceable by a court or tribunal, the remaining covenants in this Agreement will continue in effect.

6.      <u>Injunctive Relief</u>. You acknowledge that your violation of any term of this Agreement will cause irreparable injury to Company for which no adequate remedy at law is available. You therefore agree that Company, in addition to any other legal and equitable rights and remedies, will be entitled to the issuance of an order of specific performance and/or a temporary, preliminary or permanent injunctive relief, without bond, restraining any actual or threatened violation by you of any covenant in this Agreement. You agree that any claim you may have against Company, whether or not related to Company's business, will not be a defense to the enforcement by Company of any term of this Agreement.

7.      <u>Attorneys' Fees</u>. If either party to this Agreement initiates any legal action against the other party to this Agreement relating to or arising out of this Agreement for damages, injunctive relief, or any other legal or equitable remedy, the party that prevails in such legal action shall pay the other party's reasonable attorneys' fees, court costs, and reasonable out-of-pocket expenses related to the action.

8.      <u>Governing Law; Consent to Venue in Dallas County, Texas</u>. **Company and you agree that this Agreement shall be governed by the laws of the State of Texas without respect to choice of law interpretive rules, except in cases in which Texas law mandatorily requires application of another jurisdiction's laws.**

Company and you agree that any challenges to enforceability of your obligations in this Agreement must be decided by an appropriate state or federal court in Dallas County, Texas in view of the fact that Company's parent company maintains its corporate offices in Dallas County, Texas.

In exchange for Company's obligations in this Agreement, you agree that any action by Company to enforce this Agreement may, but does not have to be, decided by an appropriate state or federal court in Texas, and you expressly consent to jurisdiction of the state and federal courts of Dallas

- 3 -

Initials:   Employee   Company


DocuSign Envelope ID: FCB1BC49-C6B6-486F-B355-872E210AE4B4

County, Texas for purposes of this Agreement, and to venue in Dallas County, Texas. You waive any objections or defenses to personal jurisdiction or venue in any legal proceeding outlined in this Agreement. Company and you agree that this Agreement was made and formed within the State of Texas and within Dallas County.

9.     <u>Binding Effect</u>. This Agreement will be binding on the parties, and their heirs, executors, administrators, successors and assigns.

10.     <u>Modification</u>. Except as provided herein, this Agreement may be modified only with Company's prior written consent, and only in a written agreement of at least equal formality signed by the parties.

11.     <u>Voluntary Execution and Opportunity to Consult with Counsel</u>. You acknowledge that you have read this agreement, understand its contents and effect, execute it voluntarily and with the intent to be bound, and have had the opportunity to consult with legal counsel of your choice to obtain advice regarding any aspect of this Agreement.

12.     <u>Entire Agreement</u>. The parties hereto agree that this Agreement sets forth all of the promises, covenants, agreements, conditions, and understandings between them relating to the subject matter of this Agreement. Notwithstanding the foregoing, if you have entered or subsequently enter any other agreement with Company containing non-competition, non-solicitation, and/or non-disclosure or non-use restrictions, including the Confidentiality Agreement, Non-Solicitation Agreement, and Agreement Not to Compete During Employment, you shall also be bound by such other agreement and restrictions in addition to this Agreement except as expressly set forth in the following sentence contained in this Section 12. To the extent you have previously agreed to any prior non-competition restrictions with Company that apply after your employment with Company and to the extent there are any inconsistencies between the post-employment non-competition restrictions set forth in this Agreement and the prior post-employment non-competition restrictions to which you previously agreed, then the prior post-employment non-competition restrictions to which you agreed shall control and govern, unless the prior post-employment non-competition restrictions are deemed to be unenforceable and are not "blue penciled" or modified and enforced in part, in which case the post-employment non-competition restrictions set forth in this Agreement shall govern. To the extent there is any ambiguity between which set of post-employment non-competition restrictions is more restrictive, then the post-employment non-competition restrictions set forth in this Agreement shall govern and control. This Agreement shall be in addition to, and, except as expressly set forth above, does not replace or supersede, any other contract or agreement governing your employment. No subsequent contract or agreement shall be deemed to supersede or replace this Agreement unless specifically and expressly set forth therein.

***[Signature page to follow.]***

Employee     Company

Initials:

DocuSign Envelope ID: FCB1BC49-C6B6-486F-B355-872E210AE4B4

IN WITNESS WHEREOF, the parties have executed this Agreement as of the Effective Date.

**EMPLOYEE**

Employee's Signature: _Clinton Squadroni_

Employee's Printed Name: Clinton Squadroni

Signature Date: 4/18/2017

**COMPANY:  WWEX FRANCHISE HOLDINGS, LLC**

By: _Rich Kolman_

    Richard L. Kolman
    Senior Vice President, General Counsel and Chief Compliance Officer

*Counter-Signature Date: 4/18/2017

*Effective Date*

Initials:   Employee   Company

DocuSign Envelope ID: FCB1BC49-C6B6-486F-B355-872E210AE4B4

## Exhibit One

It is impossible to identify each and every data point that the Company considers "confidential."

Confidential Information means the proprietary, confidential or competitively sensitive information that has been developed, obtained, or acquired by the Company and its affiliates for use in or for the benefit of the Business, including but not limited to, business plans and methods; contracts; databases; forms; know-how; knowledge; customer names, customer lists, customer contact information, and other customer information; prospective customer lists and information; information regarding the Company's and its affiliates' business relationship with UPS; information regarding the Company's and its affiliates' business relationships with franchisees, affiliates of franchisees, and regarding prospective franchisees; information regarding the Company's and its affiliates' business relationships with their suppliers, vendors, and subcontractors; information that you knew, or reasonably should have known, was not intended for disclosure to Worldwide Express franchisees; business strategies; marketing strategies; manuals; market research; sales, organizational, operational and/or marketing plans; methods; processes; records; specifications; standards; techniques; skillsets and compensation of other employees of the Company or its affiliates and of employees of franchisees; proprietary hardware and software systems; supply chain business methods; pricing information; profit margin information; the legal advice requested by or provided to the Company or its affiliates by either internal or external counsel; such other trade secret, proprietary, confidential or competitively sensitive information as may be periodically identified and treated by the Company and its affiliates as confidential; and any other information that gives the Company or its affiliates a competitive advantage.

Confidential Information does not include, and this Agreement does not apply to, information that is: (a) previously known to you; (b) independently developed in good faith by you, and other than in connection with your employment with the Company, without accessing, using, or relying in any way upon the Company's Confidential Information; (c) already in your possession on a non-confidential basis or by any means other than through your employment with the Company or breach of this Agreement, or (d) part of the public domain, or becomes generally available to the public, other than through a wrongful act by you or another non-owner of such information.

- 6 -

Initials:   Employee   Company

# EXHIBIT B

DocuSign Envelope ID: FCB1BC49-C6B6-486F-B355-872E210AE4B4

## CONFIDENTIALITY AGREEMENT, NON-SOLICITATION AGREEMENT, AND AGREEMENT NOT TO COMPETE DURING EMPLOYMENT

This Confidentiality Agreement, Non-Solicitation Agreement, and Agreement Not to Compete During Employment ("Agreement") is entered into by and between WWEX Franchise Holdings, LLC, a Delaware limited liability company, and its predecessors, successors, subsidiaries and other affiliates ("Company" or, as applicable, "our") and the employee whose name is set forth in the signature area below ("Employee" or, as applicable, "you" or "your"). This Agreement shall be effective on the date counter-signed below by the Company (the "Effective Date"). Nothing in this Agreement changes the "at will" nature of the employment relationship between you and the Company, meaning that either you or the Company can terminate your employment at any time and for any reason or no reason.

Background, Recitals, and Acknowledgements

A.   The Company operates certain WORLDWIDE EXPRESS businesses throughout the United States that resell domestic and international small parcel, freight and other shipping services using the WORLDWIDE EXPRESS System (the "Business").

B.   When you were hired, you were: (1) provided a copy of our employee handbook (the "Handbook"); and (2) notified that you must comply with all of the policies, duties and restrictions described in the Handbook, as may be updated from time to time.

C.   One of our policies described in the Handbook is the Code of Ethics Policy. The Handbook states that any violation of our Code of Ethics Policy will subject the employee to administrative disciplinary action up to and possibly including immediate discharge.

D.   Our Code of Ethics Policy includes a section titled "Confidential Information." Exhibit One which is attached to this Agreement, describes: (1) our "Confidential Information;" and (2) your (and each employee's) obligations and restrictions (including non-disclosure) as regarding our Confidential Information. To maintain economic vitality, the Company must protect its and its affiliates' Confidential Information, and it is the duty of every employee to contribute to the effort.

E.   The Company desires to employ you or continue to employ you, as applicable; you desire to be employed or continue to be employed by the Company; and the Company has entrusted, or is committed to entrust you with Confidential Information related to the performance of your job duties, as well as valuable business relationships with customers, vendors, carriers, and employees of the Company and its affiliates, and with franchisees of the Company's affiliates.

F.   You acknowledge that certain methods of doing business and other elements comprising the Confidential Information and the WORLDWIDE EXPRESS System, as well as the Company's and its affiliates' customer, franchisee, vendor, carrier and employee relationships, are distinctive, commercially valuable and have been developed by the Company and its affiliates at great effort, skill, time and expense; that you will have regular and continuing access to job-specific Confidential Information and valuable training regarding the Business and WORLDWIDE EXPRESS System and to such valuable relationships of the Company and its affiliates; and that you recognize your obligation to promote, develop, and protect the Business. You acknowledge that any attempt on your part to solicit, entice or persuade the Company's or its affiliates' customers or franchisees to

Employee     Company

Initials:

- 1 -

DocuSign Envelope ID: FCB1BC49-C6B6-486F-B355-872E210AE4B4

cease doing business with the Company or its affiliates, or to divert or attempt to divert business from the Company or its affiliates' franchisees, or otherwise interfere with the Company's or its affiliates' relationships with its customers, prospective customers, franchisees, prospective franchisees, vendors, carriers, or employees would be harmful and damaging to the Company.

G.      The parties hereto agree that the restrictions set forth in this Agreement are reasonable and necessary to protect the Company's legitimate business interests in light of the nature of your responsibilities and duties.

H.      The covenants by you in this Agreement are conditions precedent to your employment or continued employment by the Company.

**For good and valuable consideration mutually exchanged, including the consideration set forth above, Employee and Company agree as follows:**

### Confidentiality and Non-Disclosure Agreement

1.      During and forever after his or her employment by Company, Employee shall comply with the non-disclosure and other duties and restrictions related to Company's and its affiliates' Confidential Information as are described in Exhibit One.  You shall be bound by the terms set forth in Exhibit One regardless of what terms appeared in the Handbook when you were hired.

2.      During his or her employment with the Company, the Company shall provide Employee with access to selected Confidential Information necessary for the performance of Employee's duties.  In return, Employee promises to preserve and protect the Confidential Information both during and after employment.  Employee's obligation to preserve and protect includes a commitment not to misappropriate the Confidential Information for personal or third-party usage.

### Non-Solicitation Agreements

3.      During your employment with Company and for one (1) year after the later of: 1) termination of your employment with the Company, regardless of the cause of termination (including, but not limited to, involuntary termination or your voluntary resignation), or 2) unless prohibited by applicable law, the date of final judgment or order of any court or tribunal that enforces the restrictions in this subparagraph, you will not, directly or indirectly, for yourself, or through, on behalf of, or in conjunction with any person or entity, solicit, entice or persuade, or attempt to solicit, entice or persuade, any customer, prospective customer, franchisee, prospective franchisee, carrier, or vendor from doing business with the Company, its affiliates, or any WORLDWIDE EXPRESS franchisee or to divert or attempt to divert any business, customer, or prospective customer of the Company, its affiliates, or any WORLDWIDE EXPRESS franchisee to any competitor or other person by inducement or otherwise.

4.      During your employment with the Company and for one (1) year after the later of: 1) termination of your employment with the Company, regardless of the cause of termination (including, but not limited to, involuntary termination or your voluntary resignation), or 2) unless prohibited by applicable law, the date of final judgment or order of any court or tribunal that enforces the restrictions in this subparagraph, you will not, without the prior written consent of the Company, directly or indirectly, for yourself, or through, on behalf of, or in conjunction with any person or

- 2 -

Employee   Company

Initials:

entity, employ or engage as an independent contractor or seek to employ or engage as an independent contractor any person who, within the preceding 6 months, has been an employee or independent contractor of the Company, any of its affiliates, or any WORLDWIDE EXPRESS franchisee, or induce or seek to induce any person who is an employee or independent contractor of the Company, any affiliate of the Company, or any WORLDWIDE EXPRESS franchisee to leave his or her employment or terminate his or her independent contractor relationship.

### Agreement Not to Compete During Employment

5.      During your employment with the Company, you will not, without the prior written consent of the Company, directly or indirectly, for yourself, or through, on behalf of, or in conjunction with any other person or entity, own, operate, maintain, engage in, have any interest in, be employed by or perform any service relating to parcel, freight, or other shipping services, where your duties are in whole or in part are substantially similar to or overlap with your duties for the Company, either within the United States or elsewhere if relating to products or services offered in the United States, for any business which offers services or products that are the same as or substantially similar to services or products that were offered by the Company or its affiliates during your employment with the Company.  The non-competition covenant in this Agreement will not apply to any ownership by you of less than a 5% beneficial interest in the outstanding equity securities of any publicly-held corporation.

### Covenants and Agreements Concerning Company Property

6.      You agree that all property of the Company, including company-supplied devices, records of customers, potential customers, and all other records (whether paper, electronic or some other form) relating in any manner to the Business, whether prepared by you or otherwise coming into your possession, are the exclusive property of the Company. Additionally, you agree that all files, records, documents, drawings, specifications and similar items relating to the Business, including all copies of those items, whether prepared by you or otherwise coming into your possession, will not be removed by you from the Company's premises without the prior written consent of the Company. Any devices or records not at the Company's premises will immediately be returned to the Company by you on termination of your employment, regardless of the cause of termination (including, but not limited to, involuntary termination or your voluntary resignation).

7.      You agree that, on request by the Company, or on termination of your employment for any reason (including, but not limited to, involuntary termination or your voluntary resignation), you will promptly return to the Company all company-supplied devices, documents, electronically stored information, or other tangible property in your possession or under your control that contain Confidential Information, and you will not retain, in whole or in part, any copies, extracts or other reproductions (whether paper, electronic or some other form) of such Confidential Information. Notwithstanding the return of the Confidential Information, you acknowledge and agree that you will continue to be bound by your obligations hereunder, which survive any termination of this Agreement.

### Other Terms

8.      The Company and you agree that the Company, its affiliates, and franchisees of its affiliates have operations throughout the United States.  Therefore, you agree that you shall be restricted from

Employee    Company

Initials: 

engaging in conduct proscribed by Sections 3 through 5 anywhere within the United States or elsewhere if relating to products or services offered in the United States.

9.   You acknowledge that the Company may reduce the scope of any covenant or subpart in Sections 3 through 5 without your consent, effective immediately on written notice from the Company, and you agree to comply promptly with any covenant or subpart so modified, which will be fully enforceable notwithstanding anything to the contrary in this Agreement.  To the extent a court determines that any restriction set forth in this Agreement is overbroad in any respect, the parties intend that the court modify such restriction and enforce it to the fullest extent the court deems reasonable.

10.   Each covenant and subpart of a covenant in this Agreement is independent of each other covenant and subpart of a covenant of this Agreement. If a portion of a covenant or subpart in this Agreement is held invalid or unenforceable by a court or tribunal, you agree to be bound by any lesser covenant or subpart subsumed within the terms of the covenant or subpart that imposes the maximum duty permitted by law, as if the resulting covenant or subpart were separately stated in this Agreement. If an entire covenant in this Agreement is held invalid or unenforceable by a court or tribunal, the remaining covenants in this Agreement will continue in effect.

11.   Violation by Employee of his or her non-disclosure or other duties or restrictions related to Company's Confidential Information, or violations by Employee of his or her non-solicitation, non-recruitment, or non-competition duties or restrictions, will subject Employee to administrative disciplinary action up to and possibly including immediate termination of employment.  Company reserves and shall be entitled to seek all other legal and equitable remedies for breach of this Agreement, including injunctive relief and damages.

12.   You acknowledge that your violation of any term of this Agreement will cause irreparable injury to the Company for which no adequate remedy at law is available. You therefore agree that the Company, in addition to any other legal and equitable rights and remedies, will be entitled to the issuance of an order of specific performance and/or a temporary, preliminary or permanent injunctive relief, without bond, restraining any actual or threatened violation by you of any covenant in this Agreement. You agree that any claim you may have against the Company, whether arising in relation to this Agreement, the Business, or otherwise, will not be a defense to the enforcement by the Company of any term of this Agreement.

13.   If Employee has any questions regarding his or her duties or restrictions related to Company's Confidential Information or related to Employee's non-solicitation, non-recruitment, or non-competition duties or restrictions, Employee shall contact Company's Human Resources Department to seek clarification.

14.   This Agreement (including Exhibit One, which is incorporated by reference) constitutes the entire understanding and agreement between the Company and you regarding its subject matter. Notwithstanding the foregoing, if you have entered or subsequently enter into any other agreement with the Company or its affiliates containing non-competition restrictions that apply after your employment, you shall also be bound by such other agreement and restrictions in addition to this Agreement.  You agree that, in all events, the terms of this Agreement shall be binding upon you.

Employee   Company

Initials:   

- 4 -

DocuSign Envelope ID: FCB1BC49-C6B6-486F-B355-872E210AE4B4

15. If either party to this Agreement initiates any legal action against the other party to this Agreement relating to or arising out of this Agreement for damages, injunctive relief, the return of property, or any other legal or equitable remedy, the party that prevails in such legal action shall pay the other party's reasonable attorneys' fees, court costs, and reasonable out-of-pocket expenses related to the action.

16. **The Company and you agree that this Agreement shall be governed by the laws of the State of Texas without respect to choice of law interpretive rules, except in cases in which Texas law mandatorily requires application of another jurisdiction's laws.**

The Company and you agree that any challenges to enforceability of your obligations in this Agreement must be decided by an appropriate state or federal court in Dallas County, Texas in view of the fact that the Company maintains its corporate offices in Dallas County, Texas.

In exchange for the Company's obligations in this Agreement, you agree that any action by the Company to enforce this Agreement may, but does not have to be, decided by an appropriate state or federal court in Texas, and you expressly consent to jurisdiction of the state and federal courts of Dallas County, Texas for purposes of this Agreement, and to venue in Dallas County, Texas. You waive any objections or defenses to personal jurisdiction or venue in any legal proceeding outlined in this Agreement. The Company and you agree that this Agreement was made and formed within the State of Texas and within Dallas County.

17. You acknowledge that you have read this agreement, understand its contents and effect, execute it voluntarily and with the intent to be bound, and have had the opportunity to consult with legal counsel of your choice to obtain advice regarding any aspect of this Agreement.

18. Any amendments to this Agreement must be in a writing signed by both parties, except that Company may, from time to time, unilaterally update the "Confidential Information" section of the Handbook, which updates will be deemed (to the extent not prohibited by applicable law) to automatically update this Agreement's <u>Exhibit One</u>.

*[Signature page to follow.]*

Employee   Company

Initials:

DocuSign Envelope ID: FCB1BC49-C6B6-486F-B355-872E210AE4B4

## AGREED TO AND ACCEPTED BY:

**EMPLOYEE**

Employee's Signature: _Clinton Squadroni_ _____

Employee's Printed Name: Clinton Squadroni _____

Signature Date: 4/18/2017 _____

**COMPANY:  WWEX FRANCHISE HOLDINGS, LLC**

By: _Rick kolman_ _____

Richard L. Kolman
Senior Vice President, General Counsel and Chief Compliance Officer

*Counter-Signature Date: 4/18/2017 _____

*Effective Date*

Employee  Company

Initials:

## Exhibit One

**As of this Confidentiality Agreement's effective date, the following constitutes Employee's duties and restrictions under the Code of Ethics Policy, as set forth in the "Confidential Information" section of the Company's Employee Handbook:**

The disclosure or use of any confidential product information, data on decisions, plans, or any other information which might be contrary to the interest of the Company without prior authorization, is prohibited. The misuse, unauthorized access to, access for the benefit of or on behalf of another person or entity, or mishandling of confidential information, particularly personnel information, is strictly prohibited and will subject an associate to the Discipline Policy up to and including immediate discharge, as well as other applicable legal remedies.

Without limitation, an example of prohibited disclosure of Company's Confidential Information would be an employee's disclosure to any Worldwide Express franchisee of any information which employee knew, or reasonably should have known, was not intended for disclosure to any such franchisee.

It is impossible to identify each and every data point that the Company considers "confidential."

Confidential Information means the proprietary, confidential or competitively sensitive information that has been developed, obtained, or acquired by the Company and its affiliates for use in or for the benefit of the Business, including but not limited to, business plans and methods; contracts; databases; forms; know-how; knowledge; customer names, customer lists, customer contact information, and other customer information; prospective customer lists and information; information regarding the Company's and its affiliates' business relationship with UPS; information regarding the Company's and its affiliates' business relationships with franchisees, affiliates of franchisees, and regarding prospective franchisees; information regarding the Company's and its affiliates' business relationships with their suppliers, vendors, and subcontractors; information that you knew, or reasonably should have known, was not intended for disclosure to Worldwide Express franchisees; business strategies; marketing strategies; manuals; market research; sales, organizational, operational and/or marketing plans; methods; processes; records; specifications; standards; techniques; skillsets and compensation of other employees of the Company or its affiliates and of employees of franchisees; proprietary hardware and software systems; supply chain business methods; pricing information; profit margin information; the legal advice requested by or provided to the Company or its affiliates by either internal or external counsel; such other trade secret, proprietary, confidential or competitively sensitive information as may be periodically identified and treated by the Company and its affiliates as confidential; and any other information that gives the Company or its affiliates a competitive advantage.

Confidential Information does not include, and this Agreement does not apply to, information that is: (a) previously known to you; (b) independently developed in good faith by you, and other than in connection with your employment with the Company, without accessing, using, or relying in any way upon the Company's Confidential Information; (c) already in your possession on a non-confidential basis or by any means other than through your employment with the Company or breach of this Agreement, or (d) part of the public domain, or becomes generally available to the public, other than through a wrongful act by you or another non-owner of such information.

Employee   Company

Initials:

# EXHIBIT C

DocuSign Envelope ID: A0D366AD-365F-4029-A7FF-AB84E9663C71

## ACCORD TOPCO LP

## CLASS B UNIT GRANT AGREEMENT

**THIS CLASS B UNIT GRANT AGREEMENT** (this "Agreement") is made as of September 30, 2021 (the "Grant Date") by and between Accord Topco LP, a Delaware limited partnership (the "Partnership"), and ___Clinton Squadroni_____ ("Executive"). Capitalized terms used but not otherwise defined herein shall have the meaning assigned to such terms in that certain Amended and Restated Limited Partnership Agreement, dated as of July 26, 2021, by and among the Partnership, Accord GP LLC and the limited partners of the Partnership from time to time party thereto, as amended, supplemented or otherwise modified from time to time in accordance with its terms (the "LP Agreement").

**NOW, THEREFORE,** in consideration of the mutual covenants and promises hereinafter set forth and for other good and valuable consideration, the parties hereto hereby mutually covenant and agree as follows:

1.  Issuance of Units.

(a) Issuance. Upon execution of this Agreement, the Partnership will issue to Executive, and Executive will accept from the Partnership, [REDACTED] Class B Units (the "Time Vesting Units"), and [REDACTED] Class B Units (the "Exit Event Vesting Units"), without any consideration paid, or any other Capital Contribution made or deemed made, by or on behalf of Executive in respect thereof, subject to the provisions of the LP Agreement. The Class B Units granted hereunder (and any units of equity or other capital interests issued with respect to such Class B Units, including by way of any split, combination, distribution or other recapitalization of such Class B Units) are referred to herein as the "Executive Units." The Hurdle Amount of the Executive Units as of the date hereof is $1.00 and may be adjusted from time to time as provided in the LP Agreement and Section 1(h) hereof. For the avoidance of doubt, the Executive Units are intended to be classified as a "profits interest" (as that term is used in Revenue Procedures 93-27 and 2001-43), and accordingly, the Executive Units shall not share in the value of the Partnership's assets as of the Grant Date, and shall only share in any subsequent appreciation in value of the Partnership's assets following the Grant Date in accordance with the LP Agreement.

(b) Partnership Reliance. By execution hereof, Executive acknowledges that the Partnership is relying upon the accuracy and completeness of the representations and warranties contained herein in complying with the Partnership's obligations under applicable securities laws.

(c) Tax Election. Executive shall make and file an effective election with the United States Internal Revenue Service under Section 83(b) of the Code in the form of Exhibit A attached hereto and promptly thereafter shall deliver a copy of the executed Section 83(b) election to the Partnership.

(d) No Certificates. The Executive Units shall be uncertificated unless otherwise determined by the Partnership.

(e) Executive's Representations and Warranties. In connection with the grant of the Executive Units hereunder, Executive hereby represents and warrants to the Partnership that:

(i)     Executive is acquiring the Executive Units to be acquired by Executive hereunder for Executive's own account with the present intention of holding such securities for investment purposes and that Executive has no intention of selling such securities in a public distribution in violation of the federal securities laws or any applicable state or foreign securities laws. Executive acknowledges that the Executive Units have not been registered under the Securities Act or applicable state or foreign securities laws and that the Executive Units will be issued to Executive in reliance on exemptions from the registration requirements of the Securities Act and applicable state and foreign statutes and in reliance on Executive's representations and agreements contained herein.

(ii)     The execution, delivery and performance by Executive of this Agreement and the consummation of the transactions contemplated hereby do not and will not (with or without the giving of notice, the lapse of time, or both) result in a violation or breach of, conflict with, cause increased liability or fees, or require approval, consent or authorization under (A) any law, rule or regulation applicable to Executive, or (B) any contract to which Executive is a party or by which Executive or any of Executive's properties or assets may be bound or affected.

(iii)     Executive is an employee of the Partnership and/or its Affiliates.

(iv)     Executive has had an opportunity to ask the Partnership and its representatives questions and receive answers thereto concerning the terms and conditions of the Executive Units to be acquired by Executive hereunder and has had full access to such other information concerning the Partnership and its Affiliates as Executive may have requested in making Executive's decision to invest in the Executive Units being issued hereunder.

(v)     Executive acknowledges that the Executive Units are subject to the restrictions contained in the LP Agreement, and Executive has received and reviewed a copy of the LP Agreement.

(vi)     Executive will not sell or otherwise Transfer any Executive Units without registration under the Securities Act (and any applicable federal, state and foreign securities laws) or an exemption therefrom, and provided there exists such a registration or exemption, any such Transfer of Executive Units by Executive or subsequent holders of Executive Units will be in compliance with the provisions of this Agreement and the LP Agreement.

(vii)     Executive has all requisite legal capacity and authority to carry out the transactions contemplated by this Agreement and the LP Agreement, and the execution, delivery and performance by Executive of this Agreement and the LP Agreement and all other agreements contemplated hereby and thereby to which Executive is a party have been duly authorized by Executive.

(viii)     Executive has only relied on the advice of, or has consulted with, Executive's own legal, financial and tax advisors, and the determination of Executive to acquire the Executive Units pursuant to this Agreement has been made by Executive independent of any statements or opinions as to the advisability of such acquisition or as to the properties, business, prospects or condition (financial or otherwise) of the Partnership or any of its Affiliates which may have been made or given by any other Person (including all Persons acquiring Units on or prior to

the date hereof) or by any agent or employee of such Person and independent of the fact that any other Person has decided to become a holder of Units.

(ix)    Executive is not acquiring the Executive Units as a result of or subsequent to any advertisement, article, notice or other communication published in any newspaper, magazine, internet publication or similar media or broadcast over television, radio or the internet or presented at any public seminar or meeting, or any solicitation of a subscription by a Person not previously known to Executive in connection with investments in securities generally.

(x)    All of the representations and warrants set forth in <u>Exhibit B</u> are true and correct.

(f)    <u>Additional Acknowledgements</u>.  As an inducement to the Partnership to issue the Executive Units to Executive and as a condition thereto, Executive hereby acknowledges and agrees that:

(i)    neither the issuance of the Executive Units to Executive nor any provision contained in this Agreement or the LP Agreement shall entitle Executive to remain in the service of the Partnership or any of its Affiliates or affect the right of the Partnership or any of its Affiliates to terminate Executive's service at any time; and

(ii)    except as expressly set forth in the LP Agreement or as required by applicable law, the Partnership shall have no duty or obligation to disclose to Executive, and Executive shall have no right to be advised of, any material information regarding the Partnership or any of its Affiliates at any time prior to, upon or in connection with the repurchase of Executive Units upon the termination of Executive's service with the Partnership and/or any of its Affiliates or as otherwise provided hereunder.

(g)    <u>Compensatory Arrangements</u>.  The Partnership and Executive hereby acknowledge and agree that this Agreement has been executed and delivered, and the Executive Units have been issued hereunder, in connection with and as a part of the compensation and incentive arrangements between the Partnership and its Affiliates, on the one hand, and Executive, on the other hand.  Each of the Executive Units granted hereunder is intended to qualify for an exemption from the registration requirements under the Securities Act, and under similar exemptions under applicable state securities laws.  In the event that any provision of this Agreement would cause the Executive Units granted hereunder not to qualify for an applicable exemption from registration under the Securities Act, Executive and the Partnership agree that this Agreement shall be deemed automatically amended to the extent necessary to cause the Executive Units to qualify for such an exemption.

(h)    <u>Adjustments</u>.  If there shall occur any change with respect to the outstanding Units by reason of any recapitalization, reclassification, unit split, reverse unit split or any merger, reorganization, consolidation, combination, spin-off or other similar partnership change affecting the Units, the Partnership shall, in a reasonable manner but only to the extent that it deems appropriate and equitable in its discretion, cause an adjustment to be made in the number of Executive Units granted hereunder, the Hurdle Amount and any other terms hereunder that are affected by the event to prevent dilution or enlargement of Executive's rights hereunder.

DocuSign Envelope ID: A0D366AD-365F-4029-A7FF-AB84E9663C71

2.      Vesting of Units.  The Executive Units shall be subject to the vesting and forfeiture conditions contained on Exhibit C hereto.

3.      Restrictions Generally.  The Executive Units are subject to the provisions of the LP Agreement, which agreement provides, among other things, restrictions on Transfer, certain drag-along obligations and cooperation obligations with respect to the Executive Units.

4.      Repurchase Rights.  The Executive Units shall be subject to the repurchase provisions of Section 9.06 of the LP Agreement.

5.      Joinder to LP Agreement and Spousal Consent.

(a)      Joinder.  If Executive is not already a party to the LP Agreement, then as a condition to receiving any Executive Units Executive hereby agrees to join and become a party to and to comply with the provisions of, and the Partnership hereby agrees to accept Executive as a party to, the LP Agreement, and this Agreement shall serve as Executive's joinder to the LP Agreement. The Partnership and Executive each acknowledge and agree that Executive shall be bound by and subject to the applicable obligations under the LP Agreement.  In the event that Executive fails to timely comply with any of Executive's obligations under the LP Agreement as determined by the Board in good faith, Executive may be required to immediately forfeit any or all of the Executive Units outstanding at the time of such non-compliance without any consideration being paid therefor.  By virtue of the grant of the Executive Units hereunder and Executive's execution of this Agreement, Executive hereby irrevocably constitutes and appoints, and hereby grants Executive's perpetual and irrevocable power of attorney to, the Partnership, with full right, power and authority to take all actions necessary and/or desirable on behalf of Executive to effectuate the provisions of Section 4 hereof and the provisions of the LP Agreement with respect to all Executive Units owned by Executive.  Notwithstanding any duty otherwise existing at law or in equity, to the fullest extent permitted by law, the Partnership shall not by reason of this Agreement owe a fiduciary or other duty to the Executive.  The appointment of the Partnership as the attorney-in-fact, agent and representative of the Executive and the power of attorney granted thereby shall be irrevocable and deemed to be coupled with, and given to secure, a proprietary interest of the donee of the power or performance of an obligation owed to the donee and shall survive and shall not be affected by the subsequent death, lack of capacity, insolvency, bankruptcy or dissolution of Executive. Executive has entered into the power of attorney in order to, among other things, permit the Partnership to act on his or her behalf to execute and deliver all such agreements, instruments and documents and to otherwise to effectuate Section 4 hereof and the provisions of the LP Agreement.

(b)      Spousal Consent. If Executive is married or has entered into a registered domestic partnership under state law as of the date of this Agreement, Executive shall deliver to the Partnership a separate consent and agreement executed by his or her spouse or domestic partner in substantially the form of Exhibit D hereto (a "Spousal Consent").  Additionally, to the extent not previously delivered and if requested by the Partnership after the date of this Agreement, Executive shall cause his or her spouse or domestic partner, as applicable, to execute and deliver a Spousal Consent.  The signature of a spouse on a Spousal Consent shall not be construed as making such signatory a Partner or a party to this Agreement or the LP Agreement except as may otherwise be set forth in such consent.  Executive will certify his or her marital status to the Partnership at the Partnership's request.

6.      <u>Restrictive Covenants</u>.

(a)      <u>Confidentiality</u>.

(i)      During the course of Executive's employment with the Partnership or any of its Affiliates, Executive will have access to Confidential Information.  For purposes of this Agreement, "<u>Confidential Information</u>" means all data, information, ideas, concepts, discoveries, trade secrets, inventions (whether or not patentable or reduced to practice), innovations, improvements, know-how, developments, techniques, methods, processes, treatments, drawings, sketches, specifications, designs, patterns, models, plans and strategies, and all other confidential or proprietary information or trade secrets in any form or medium (whether merely remembered or embodied in a tangible or intangible form or medium) whether now or hereafter existing, relating to or arising from the past, current or potential business, activities and/or operations of the Partnership or any of its Affiliates, including, without limitation, any such information relating to or concerning finances, sales, marketing, advertising, transition, promotions, pricing, personnel, franchisees, distributors, brokers, carriers, clients, customers, suppliers, vendors and/or competitors.  Executive agrees that Executive shall not, directly or indirectly, use, make available, sell, disclose or otherwise communicate to any Person, other than in the course of Executive's assigned duties and for the benefit of the Partnership and its Affiliates, either during the period of Executive's employment or at any time thereafter, any Confidential Information or other confidential or proprietary information received from third parties subject to a duty in favor of the Partnership and its Affiliates to maintain the confidentiality of such information, and to use such information only for the benefit of the Partnership and its Affiliates.  The foregoing shall not apply to information that (x) was known to the public prior to its disclosure to Executive; or (y) becomes generally known to the public subsequent to disclosure to Executive through no wrongful act of Executive or any representative of Executive.  Notwithstanding the foregoing, to the extent the Executive is required to disclose by applicable law, regulation or legal process to disclose Confidential Information, the Executive shall provide the Partnership with prior notice of the contemplated disclosure (unless prohibited by applicable law) and cooperate with the Partnership, at the Partnership's expense, in seeking a protective order or other appropriate protection of such information, and in any event the Executive shall only disclose the minimum amount of Confidential Information that is required by the applicable law, regulation or legal process.  The Executive hereby agrees not to disclose the terms and conditions hereof to any Person or entity, other than immediate family members, legal advisors or personal tax or financial advisors or prospective future employers solely for the purpose of disclosing the limitations on Executive's conduct imposed by the provisions of this <u>Section 6</u> who, in each case, agree to keep such information confidential, or as required by applicable law or in connection with legal proceedings between Executive and the Partnership or one of its Affiliates relating to this Agreement.

(ii)      Notwithstanding the foregoing, nothing herein shall (x) prohibit the Executive from making reports of possible violations of federal law or regulation to any governmental agency or entity in accordance with the provisions of, and rules promulgated under, any whistleblower protection provisions of state or federal law or regulation, or from collecting any financial incentives in connection therewith, or (y) require notification or prior approval by the Partnership of any reporting described in the foregoing clause.

(iii)    In addition, in accordance with the federal Defend Trade Secrets Act of 2016, the Executive understands and acknowledges that the Partnership has informed the Executive that an individual will not be held criminally or civilly liable under any federal or state trade secret law for (x) the disclosure of a trade secret that is made in confidence to a federal, state, or local government official or to an attorney solely for the purpose of reporting or investigating a suspected violation of law, or (y) the disclosure of a trade secret that is made in a complaint or other document filed in a lawsuit or other proceeding if such filing is made under seal. Additionally, the Executive understands and acknowledges that the Partnership has informed the Executive that an individual who files a lawsuit for retaliation by an employer for reporting a suspected violation of law may disclose the trade secret to the attorney of the individual and use the trade secret information in the court proceeding if the individual files any document containing the trade secret under seal and does not disclose the trade secret, except pursuant to a court order.

(b)    Non-Competition. Executive acknowledges that (i) Executive performs services of a unique nature for the Partnership and its Affiliates that are irreplaceable, and that Executive's performance of such services to a competing business will result in irreparable harm to the Partnership, (ii) Executive has had and will continue to have access to Confidential Information which, if disclosed, would unfairly and inappropriately assist in competition against the Partnership or any of its Affiliates, (iii) in the course of Executive's employment by a competitor, Executive would inevitably use or disclose such Confidential Information, (iv) the Partnership and its Affiliates have substantial relationships with their franchisees, distributors, brokers, carriers, clients, customers, suppliers and vendors, and Executive has had and will continue to have access to these franchisees, distributors, brokers, carriers, clients, customers, suppliers and vendors, (v) Executive has received and will receive specialized training from the Partnership and its Affiliates, and (vi) Executive has generated and will continue to generate goodwill for the Partnership and its Affiliates in the course of Executive's employment. Accordingly, during Executive's employment with the Partnership or any of its Affiliates and for a period of twelve (12) months thereafter, Executive agrees not to, on Executive's own behalf or on behalf of another Person (including as an employee, service provider, contractor, consultant, adviser, licensor, lessor, officer, director, equityholder, franchisor, franchisee, distributor, broker, carrier, member, partner, joint venture or investor of another Person), engage, invest or have any interest, either directly or indirectly, as a principal or for Executive's own account, or solely or jointly with others, or as an equity holder in any corporation or other entity, in any business in the United States of America that competes with the Partnership or any its Subsidiaries or any other business outside of the United States of America that competes with the Partnership or any of its Subsidiaries in the United States of America or any other jurisdiction in which the Partnership or any of its Subsidiaries conducts material business. Notwithstanding the foregoing, nothing herein shall prohibit Executive from being a passive owner of not more than one percent (1%) of the equity securities of a publicly traded corporation engaged in a business that is in competition with the Partnership or any of its Subsidiaries, so long as Executive has no active participation in the business of such corporation.

(c)    Non-Solicitation; Non-Interference. During Executive's employment with the Partnership or any of its Affiliates and for a period of twenty-four (24) months thereafter, Executive agrees that Executive shall not, except in the furtherance of Executive's duties to the Partnership or any of its Affiliates, directly or indirectly, individually or on behalf of any other Person, firm, corporation or other entity, (i) solicit, aid or induce any actual or prospective targeted customers, franchisees, distributors, brokers, carriers, vendors, suppliers, strategic alliances or

clients of the Partnership or any of its Affiliates to purchase goods or services then sold by the Partnership or any of its Subsidiaries from, or to otherwise do business with, another Person, firm, corporation or other entity or assist or aid any other Person or entity in identifying, doing business with or soliciting any such customers, franchisees, distributors, brokers, carriers, vendors, suppliers or clients with respect to goods or services then sold by the Partnership or any of its Subsidiaries, (ii) solicit for employment or services any individuals who were employees, contractors, agents or consultants of the Partnership or any of its Subsidiaries within the twelve (12)-month period prior to the date of Executive's termination of employment with the Partnership and its Affiliates (provided that this clause (ii) shall not prohibit any general solicitations through an advertisement not specifically targeted at the Partnership, its Subsidiaries or any of their respective employees), (iii) hire, employ or engage for services any employee, consultant, agent or contractor of the Partnership or any of its Subsidiaries or (iv) interfere, or aid or induce any other Person or entity in interfering, with the relationship between the Partnership or any of its Subsidiaries and any of their respective actual or prospective targeted customers, franchisees, distributors, brokers, carriers, vendors, suppliers or clients.

(d)    <u>Inventions.</u>

(i)    Executive acknowledges and agrees that all ideas, methods, inventions, discoveries, improvements, work products, developments, software, know-how, processes, techniques, methods, works of authorship and other work product, whether patentable or unpatentable, (A) that are reduced to practice, created, invented, designed, developed, contributed to, or improved with the use of any resources of the Partnership or any of its Subsidiaries and/or within the scope of Executive's work with the Partnership or any of its Affiliates or that relate to the business, operations or actual or demonstrably anticipated research or development of the Partnership or any of its Affiliates, and that are made or conceived by Executive, solely or jointly with others, during the period of Executive's employment with the Partnership or any of its Affiliates, or (B) suggested by any work that Executive performs in connection with the Partnership or any of its Affiliates, either while performing Executive's duties with the Partnership or any of its Affiliates or on Executive's own time, but only insofar as the Inventions are related to Executive's work as an employee or other service provider to the Partnership or any of its Affiliates, shall belong exclusively to the Partnership and the applicable Affiliates (or their designees), whether or not patent or other applications for intellectual property protection are filed thereon (the "<u>Inventions</u>").  Executive will keep full and complete written records (the "<u>Records</u>"), in the manner prescribed by the Partnership and the applicable Affiliates, of all Inventions, and will promptly disclose all Inventions completely and in writing to the Partnership and the applicable Affiliates.  The Records shall be the sole and exclusive property of the Partnership and the applicable Affiliates, and Executive will surrender them upon the termination of Executive's employment with the Partnership and the applicable Affiliates, or upon request.  Executive will assign to the Partnership and the applicable Affiliates the Inventions and all patents or other intellectual property rights that may issue thereon in any and all countries, whether during or subsequent to the period of Executive's employment with the Partnership and the applicable Affiliates, together with the right to file, in Executive's name or in the name of the Partnership and the applicable Affiliates (or their designees), applications for patents and equivalent rights (the "<u>Applications</u>").  Executive will, at any time during and subsequent to the period of Executive's employment with the Partnership and the applicable Affiliates, make such applications, sign such papers, take all rightful oaths, and perform all other acts as may be reasonably requested from time

to time by the Partnership and the applicable Affiliates to perfect, record, enforce, protect, patent or register the Partnership's and the applicable Affiliates' rights in the Inventions, all without additional compensation to Executive from the Partnership, but entirely at the Partnership's expense. Executive will also execute assignments to the Partnership and the applicable Affiliates (or their designees) of the Applications, and give the Partnership and the applicable Affiliates and their attorneys all reasonable assistance (including the giving of testimony) to obtain the Inventions for the Partnership's and the applicable Affiliates' benefit, all without additional compensation to the Executive, but entirely at the Partnership's and the applicable Affiliates' expense.

(ii)     In addition, the Inventions will be deemed Work for Hire, as such term is defined under the copyright laws of the United States, on behalf of the Partnership and the applicable Affiliates and Executive agrees that the Partnership and the applicable Affiliates will be the sole owner of the Inventions, and all underlying rights therein, in all media now known or hereinafter devised, throughout the universe and in perpetuity without any further obligations to Executive. If the Inventions, or any portion thereof, are deemed not to be Work for Hire, or the rights in such Inventions do not otherwise automatically vest in the Partnership and the applicable Affiliates, Executive hereby irrevocably conveys, transfers and assigns to the Partnership and the applicable Affiliates, all rights, in all media now known or hereinafter devised, throughout the universe and in perpetuity, in and to the Inventions, including, without limitation, all of Executive's right, title and interest in the copyrights (and all renewals, revivals and extensions thereof) to the Inventions, including, without limitation, all rights of any kind or any nature now or hereafter recognized, including, without limitation, the unrestricted right to make modifications, adaptations and revisions to the Inventions, to exploit and allow others to exploit the Inventions and all rights to sue at law or in equity for any infringement, or other unauthorized use or conduct in derogation of the Inventions, known or unknown, prior to the date hereof, including, without limitation, the right to receive all proceeds and damages therefrom. In addition, Executive hereby waives any so-called "moral rights" with respect to the Inventions. To the extent that Executive has any rights in the Inventions that cannot be assigned in the manner described herein, Executive agrees to unconditionally waive the enforcement of such rights. Executive hereby waives any and all currently existing and future monetary rights in and to the Inventions and all patents and other registrations for intellectual property that may issue thereon, including, without limitation, any rights that would otherwise accrue to Executive's benefit by virtue of Executive being an employee of or other service provider to the Partnership and the applicable Affiliates.

(e)     Non-Disparagement.     Executive agrees not to make negative comments or otherwise disparage the Partnership, its Subsidiaries or any of their respective officers, directors, employees, direct or indirect equityholders, Affiliates, members, agents, services, practices or products, either orally or in writing, in a manner that could reasonably be expected to result in material adverse harm to the business or reputation of the Partnership, its Subsidiaries or any of their respective officers, directors, employees, direct or indirect equityholders, Affiliates, members, agents, services, practices or products. The foregoing shall not be violated by truthful statements made (i) in response to legal process, required governmental testimony or filings, or administrative or arbitral proceedings (including, without limitation, depositions in connection with such proceedings), (ii) in the good faith performance of Executive's duties to the Partnership or its Subsidiaries or (iii) to defend or enforce Executive's rights under this Agreement.

(f)     <u>Reasonableness of Covenants</u>.  In signing this Agreement, Executive gives the Partnership assurance that Executive has carefully read and considered all of the terms and conditions of this Agreement and the LP Agreement, including the restraints imposed under this <u>Section 6</u>.  Executive agrees that these restraints are necessary for the reasonable and proper protection of the Partnership and its Affiliates and their Confidential Information and that each and every one of the restraints is reasonable in respect of subject matter, length of time and geographic area, and that these restraints, individually or in the aggregate, will not prevent Executive from obtaining other suitable employment during the period in which Executive is bound by the restraints.  Executive acknowledges that each of these covenants has a unique, very substantial and immeasurable value to the Partnership and its Subsidiaries and that Executive has sufficient assets and skills to provide a livelihood while such covenants remain in force.  Executive further covenants that Executive will not challenge the reasonableness or enforceability of any of the covenants set forth in this <u>Section 6</u>, and that Executive will reimburse the Partnership and its Affiliates for all costs (including reasonable attorneys' fees) incurred in connection with any action to enforce any of the provisions of this <u>Section 6</u> if either the Partnership and/or its Affiliates prevails on any material issue involved in such dispute or if Executive challenges the reasonableness or enforceability of any of the provisions of this <u>Section 6</u>.  It is also agreed that each of the Partnership's Affiliates will have the right to enforce all of Executive's obligations to that Affiliate under this Agreement, including without limitation pursuant to this <u>Section 6</u>.

(g)     <u>Reformation</u>.  If it is determined by a court of competent jurisdiction in any state that any restriction in this <u>Section 6</u> is excessive in duration or scope or is unreasonable or unenforceable under applicable law, it is the intention of the parties that such restriction may be modified or amended by the court to render it enforceable to the maximum extent permitted by the laws of that state.

(h)     <u>Tolling</u>.  In the event of any violation or breach of the provisions of this <u>Section 6</u>, Executive acknowledges and agrees that the post-termination restrictions contained in this <u>Section 6</u> shall be extended by a period of time equal to the period of such violation or breach, it being the intention of the parties hereto that the running of the applicable post-termination restriction period shall be tolled during any period of such violation or breach.

(i)     <u>Survival</u>.  The obligations contained in this <u>Section 6</u> hereof shall survive the termination of Executive's employment with the Partnership or any of its Affiliates and the date on which Executive no longer holds, directly or indirectly, any equity in the Partnership and its Affiliates, and shall be fully enforceable thereafter in accordance with the terms hereof.

(j)     <u>Remedies</u>.  Executive acknowledges and agrees that the Partnership's remedies at law for a breach or threatened breach of any of the provisions of this <u>Section 6</u> would be inadequate and, in recognition of this fact, Executive agrees that, in the event of such a breach or threatened breach, in addition to any remedies at law, the Partnership, without posting any bond or other security, shall be entitled to obtain equitable relief in the form of specific performance, a temporary restraining order, a temporary or permanent injunction or any other equitable remedy which may then be available, without the necessity of showing actual monetary damages.  In the event of any material violation or breach by Executive of this <u>Section 6</u>, any Executive Units (whether vested or unvested) outstanding at the time of such violation or breach shall be immediately forfeited and cancelled as of the date of such violation or breach without any consideration being paid therefor

9

and otherwise without any further action of the Partnership whatsoever; <u>provided</u> that if such violation or breach occurs after a repurchase of the Executive Units has occurred, then the Executive immediately shall pay to the Partnership (or its applicable Subsidiary) all amounts previously paid to the Executive or his or her Permitted Transferees pursuant to Section 9.06 of the LP Agreement, and return any promissory notes issued pursuant thereto to the Partnership or its Subsidiary, which promissory notes shall be deemed canceled and of no further force or effect.

7.    <u>Entire Agreement; Amendments</u>.   This Agreement, together with the LP Agreement, contains the entire agreement between the parties hereto with respect to the subject matter contained herein, and supersedes all prior and contemporaneous agreements or understandings, whether written or oral, between the parties hereto relating to such subject matter.   No modification, amendment or waiver of any provision of this Agreement shall be effective against the Partnership or Executive unless such modification, amendment or waiver is approved in writing by the Partnership and Executive; provided that the Partnership may modify, amend or waive any provision of this Agreement without the consent of Executive unless such amendment, modification or waiver would adversely affect the rights or obligations of Executive hereunder. Notwithstanding the foregoing, any amendment or restatement to or of the LP Agreement that impacts this Agreement or the Executive Units (and other similar grant agreements and "profits interests" granted thereunder in a corresponding manner) shall be deemed an amendment to this Agreement and Executive shall be deemed to have approved and consented thereto.

8.    <u>Notices</u>.   All notices, requests, consents and other communications hereunder (each, a "<u>Notice</u>") shall be in writing and shall be deemed to have been given: (a) if mailed, two (2) Business Days after such Notice is sent, when sent via first class United States certified mail, return receipt requested, postage prepaid to the address listed below or on the signature page hereof for the party to whom the Notice is being sent (the "<u>Notice Party</u>"); (b) if hand delivered or delivered by courier, upon actual delivery of such Notice to the Notice Party at the address listed below or on the signature page hereof for such Notice Party; or (c) if sent by e-mail, on the first Business Day after the notice is sent to the e-mail address, if any, listed below or on the signature page hereof for such Notice Party.   The addresses and e-mail addresses for each party hereto for notice purposes are as follows (or as specified in a Notice given to each other party hereto in accordance with this Section 8):

    (a)     If such notice is to the Partnership, to:

           Accord Topco LP
           c/o CVC Advisors (U.S.) Inc.
           One Maritime Plaza, Suite 1610
           San Francisco, CA 94111
            Attention: Cameron Breitner
           Email: cbreitner@cvc.com

           and

           Accord Topco LP
           c/o CVC Advisors (U.S.) Inc.
           712 Fifth Avenue, 44th Floor

New York, NY 10019
Attention: Daniel Brand
Email: dbrand@cvc.com

or at such other address as the Partnership, by notice to Executive, shall designate in writing from time to time.

(b)     If such notice is to Executive, at Executive's address and email address as shown on the Partnership's records, or at such other address as Executive, by notice to the Partnership, shall designate in writing from time to time.

9.     Governing Law; Jurisdiction.  This Agreement and the rights and obligations of the parties hereto shall be governed by and construed in accordance with the laws of the State of Delaware excluding any conflict of laws rule or principle that might refer the governance or the construction of this agreement to the law of another jurisdiction.  Each party hereto, to the fullest extent permitted by law, (a) irrevocably submits to the exclusive jurisdiction of the United States District Court for the District of Delaware and the state courts of the State of Delaware, for the purposes of any suit, action or other proceeding arising out of this Agreement or any transaction contemplated hereby, (b) agrees that service of any process, summons, notice or document by U.S. certified or registered mail to such party's address as set forth in Section 8 shall be effective service of process in any action, suit or proceeding in Delaware with respect to any matters to which it has submitted to jurisdiction as set forth in the immediately preceding sentence, and (c) irrevocably and unconditionally waives any objection to the laying of venue of any action, suit or proceeding arising out of this Agreement or the transactions contemplated hereby in the United States District Court for the District of Delaware or the state courts of the State of Delaware, and hereby irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such action, suit or proceeding brought in such court has been brought in an inconvenient forum. **EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.**

10.     Compliance with Laws.  The issuance of the Executive Units pursuant to this Agreement shall be subject to, and shall comply with, any applicable requirements of any United States and non-United States federal and state securities laws, rules and regulations and any other law or regulation applicable thereto.  The Partnership shall not be obligated to issue the Executive Units pursuant to this Agreement if any such issuance would violate any such laws, rules or regulations.

11.     Binding Agreement; Assignment.  This Agreement shall inure to the benefit of, be binding upon, and be enforceable by the Partnership and its successors and assigns.  Executive shall not assign any part of this Agreement or Transfer any of the Executive Units without the prior written consent of the Partnership.

12.     Rights of Executive.  Nothing in this Agreement shall interfere with or limit in any way the right of the Partnership or any of its Affiliates to terminate Executive's service at any time (with or without Cause), nor confer upon Executive any right to continue in the employ of the

Partnership or any of its Affiliates for any period of time or to continue Executive's present (or any other) rate of compensation.

13.     Acknowledgment of Executive.   The award of the Executive Units does not entitle Executive to any benefit other than that granted under this Agreement.  Any benefits granted under this Agreement are not part of Executive's ordinary salary and shall not be considered as part of such salary in the event of severance, redundancy or resignation.

14.     Counterparts.  This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original, but all of which shall constitute one and the same instrument.

15.     Further Assurances.  Each party hereto shall do and perform (or shall cause to be done and performed) all such further acts and shall execute and deliver all such other agreements, certificates, instruments and documents as either party hereto reasonably may request in order to carry out the intent and accomplish the purposes of this Agreement.

16.     Severability.  The provisions of this Agreement shall be deemed severable.  The invalidity or unenforceability of any provision of this Agreement in any jurisdiction shall not affect the validity, legality or enforceability of the remainder of this Agreement in such jurisdiction or the validity, legality or enforceability of any provision of this Agreement in any other jurisdiction, it being intended that all rights and obligations of the parties hereunder shall be enforceable to the fullest extent permitted by applicable law.  Upon such determination that any provision, or the application of any such provision, is invalid, illegal, void or unenforceable, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties hereto as closely as possible to the fullest extent permitted by applicable law in an acceptable manner to the end that the transactions contemplated hereby are fulfilled to the greatest extent possible.

17.     Certain Tax Matters.  The parties hereto intend that the Executive Units qualify as "profits interests" within the meaning of Revenue Procedures 93-27 and 2001-43 and other related official guidance promulgated by the Internal Revenue Service.  However, the Partnership makes no guarantee with respect to the tax treatment of the Executive Units hereunder, and Executive acknowledges that the Partnership makes no representations or warranties as to any tax consequences regarding the Executive Units hereunder, and specifically agrees that the determination of any tax liability or other consequences associated with the holding, vesting or disposition of the Executive Units hereunder is Executive's sole and complete responsibility and that Executive shall pay all taxes, if any, assessed on the Executive Units or any payments in respect thereof under applicable law.

18.     Construction.  Whenever the feminine, masculine, neuter, singular or plural shall be used in this Agreement, such construction shall be given to such words or phrases as shall impart to this Agreement a construction consistent with the interest of the parties entering into this Agreement.  Where used herein, the term "federal" shall refer to the U.S. Federal government.  As used herein, (a) "or" shall mean "and/or"; (b) "including" or "include" shall mean "including without limitation." The headings and captions herein are inserted for convenience of reference only and are not intended to govern, limit or aid in the construction of any term or provision hereof, and unless otherwise specified references herein to Sections and Exhibits and references to the Sections

and Exhibits of this Agreement, and the terms "herein", "hereof", "hereto", "hereunder" and similar terms refer to this Agreement generally rather than to the particular provision in which such term is used.  It is the intention of the parties that every covenant, term, and provision of this Agreement shall be construed simply according to its fair meaning and not strictly for or against any party (notwithstanding any rule of law requiring an Agreement to be strictly construed against the drafting party), it being understood that the parties to this Agreement are sophisticated and have had adequate opportunity and means to retain counsel to represent their interests and to otherwise negotiate the provisions of this Agreement.  Unless expressly provided to the contrary in this Agreement, any action, consent, approval, election, decision or determination to be made by the Board under or in connection with this Agreement (including any act by the Board within its "discretion" under this Agreement and the execution and delivery of any documents or agreements on behalf of the Partnership), shall be in the sole and absolute discretion of the Board, without having to take into account the rights, obligations or interests of any particular Person. Except as otherwise expressly provided herein, references in this Agreement to any agreement, articles, by-laws, instrument or other document are to such agreement, articles, by-laws, instrument or other document as amended, modified or supplemented from time to time.  To the extent that any ambiguity or inconsistency arises with respect to any provision(s) of this Agreement, the Board shall resolve such ambiguity or inconsistency in good faith and such resolution shall be binding upon the parties hereto.

**[END OF PAGE]**
**[SIGNATURE PAGE FOLLOWS]**

**SIGNATURE PAGE TO CLASS B UNIT GRANT AGREEMENT**

**IN WITNESS WHEREOF,** the parties hereto have executed this Agreement as of the date first written above.

**Accord Topco LP**

By:_____

Name: Dan Brand_____

Title: Vice President and Treasurer_____

## SIGNATURE PAGE TO CLASS B UNIT GRANT AGREEMENT
### *(continued)*

**EXECUTIVE**

_____

Executive's Signature

Executive's Address

1122 Aline Ct.

South Bend, IN 46614

_____

State of Residence: Indiana
*(for purposes of the spousal consent set forth on Exhibit D attached hereto)*

DocuSign Envelope ID: A0D366AD-365F-4029-A7FF-AB84E9663C71

# **EXHIBIT A**

[*See attached.*]

## PROTECTIVE ELECTION TO INCLUDE MEMBERSHIP INTEREST IN GROSS INCOME PURSUANT TO SECTION 83(b) OF THE INTERNAL REVENUE CODE

On September 30, 2021, the undersigned executed an incentive unit grant agreement (the "Unit Grant Agreement") pursuant to which equity interests (the "Incentive Units") in Accord Topco LP (the "Partnership") were issued in connection with the provision of services by the undersigned to or for the benefit of the Partnership or its affiliates.  Pursuant to the Unit Grant Agreement and the Amended and Restated Limited Partnership Agreement, dated as of July 26, 2021 (the "LP Agreement"), the holder of the Incentive Units is entitled to an interest in Partnership capital exactly equal to the amount paid or to be paid therefor and an interest in Partnership profits, and so the Incentive Units qualify as "profits interests" within the meaning of Revenue Procedure 93-27 as of the date that the Incentive Units are issued.  If the relationship under the Unit Grant Agreement ceases, then under certain circumstances the amount that the holder of the Incentive Units will be entitled to receive as a result of a disposition of the Incentive Units may be less than the fair market value thereof.  Hence, the Incentive Units are subject to a substantial risk of forfeiture.

Based on Section 83 of the Internal Revenue Code of 1986, as amended (the "Code"), the Treasury Regulations promulgated thereunder, Treasury Regulation §1.721-1(b), Proposed Treasury Regulation §1.721-1(b)(1) and Revenue Procedures 93-27 and 2001-43, the undersigned believes that neither the undersigned's execution of the Unit Grant Agreement nor the issuance of the Incentive Units pursuant thereto is subject to the provisions of Section 83 of the Code.  In the event that execution of the Unit Grant Agreement or issuance of the Incentive Units is so treated, however, the undersigned desires to have such execution or issuance taxed under the provisions of Section 83(b) of the Code at the time the undersigned executed the Unit Grant Agreement and the Incentive Units were issued.

Therefore, pursuant to Section 83(b) of the Code and Treasury Regulation §1.83-2 promulgated thereunder, the undersigned hereby makes an election, with respect to the Incentive Units, to report as taxable income for the calendar year 2021 the excess (if any) of the value of the Incentive Units on September 30, 2021 over the purchase price thereof.

The following information is supplied in accordance with Treasury Regulation §1.83-2(e):

1. The name, address and social security number of the undersigned is as follows:

    Clinton Squadroni

    1122 Aline Ct.

    South Bend, IN 46614

    Social Security No.: REDACTED

2. A description of the property with respect to which the election is being made:  The Incentive Units, including any rights therein that the holder of such units acquired upon the execution of the Unit Grant Agreement and the LP Agreement.

3.  The date on which the property was transferred: September 30, 2021.  The taxable year for which the election is made:  calendar year 2021.

4.  The restrictions to which the property is subject:  If the service relationship between the undersigned and the Partnership and its affiliates ends, then under certain circumstances the amount that the holder of the Incentive Units will be entitled to receive as a result of a disposition of the Incentive Units may be less than the fair market value thereof.

5.  The fair market value of the property with respect to which the election is being made, determined without regard to any lapse restrictions and in accordance with Revenue Procedure 93-27, on the date such property is transferred:  zero ($0).

6.  The amount paid for such property:  zero ($0).

**[END OF PAGE]**
**[SIGNATURE PAGE FOLLOWS]**

A-2

## SIGNATURE PAGE TO SECTION 83(b) ELECTION

A copy of this election has been furnished to the Partnership and each other person to whom a copy is required to be furnished pursuant to Treasury Regulation 1.83-2(d).


Signature:_____

Print Name:_Clinton Squadroni_____

Dated: September 30, 2021

DocuSign Envelope ID: A0D366AD-365F-4029-A7FF-AB84E9663C71

## EXHIBIT B

## Representations and Warranties

The Executive hereby makes the following representations, warranties, covenants and acknowledgements to the Partnership as of the date hereof, except to the extent otherwise made as of a specific date (in which case such representations and warranties shall be made as of such specific date), capitalized terms used but not defined in this agreement are used with the meanings given to them in the LP Agreement (as defined below):

(i)      If the Executive is not an individual, Executive is duly organized, validly existing and in good standing under the Laws of the jurisdiction of its organization and has all requisite power and authority to conduct its business as it is now being conducted and is currently proposed by the Executive to be conducted.  The term "Law" as utilized in this Agreement shall mean any applicable federal, state, local, municipal, or foreign order, constitution, law (including common law), ordinance, rule, regulation, statute or treaty binding on the applicable Person or its assets.

(ii)      The Executive has either the full legal capacity (if the Executive is an individual) or the full power, authority and legal right (if the Executive is not an individual) to execute, deliver and perform this Agreement, the LP Agreement and any other certificate or documents called for by such agreements (collectively, the "Transaction Documents") to become an Executive hereunder and to consummate the transactions contemplated herein and therein.  The Person signing this Agreement on behalf of such entity (if applicable) has been duly authorized by the Executive to do so (if the Executive is not an individual).  The execution, delivery and performance of this Agreement, the other Transaction Documents, and the consummation of the transactions contemplated herein and therein have been or shall be duly authorized by all necessary action of the Executive, corporate or otherwise.  Each of this Agreement and each other Transaction Document, when signed on behalf of, the Executive on the signature pages hereof and thereof as contemplated hereby and thereby, shall be validly executed and delivered on behalf of the Executive and each shall constitute his, her or its legal, valid and binding obligation, enforceable against Executive in accordance with its terms, except to the extent that enforceability of obligations and the availability of certain remedies hereunder and thereunder are limited by general principles of equity and judicial discretion or by bankruptcy, insolvency, fraudulent transfer or other Laws relating to or affecting creditors' rights generally.

(iii)      The execution and delivery by the Executive of this Agreement and each other Transaction Document, the performance by the Executive of his, her or its obligations hereunder and thereunder and the consummation of the transactions contemplated herein and therein by the Executive do not and will not (A) violate, conflict with or result in a breach of any provision of such Executive's organizational documents (if the Executive is not an individual), (B) violate, constitute a default under, result in an acceleration of, create in any party the right to accelerate, terminate, modify, or cancel, or require any notice or consent under any material agreement, contract, lease, license, instrument or other arrangement to which the Executive is a party or by which Executive

or his, her or its assets are subject to or are bound, (C) violate, conflict with or result in a breach of any Law or order, award, decision, injunction, judgment, ruling, decree, charge, writ, subpoena or verdict entered, issued, made or rendered by any governmental authority or arbitrator, whether temporary or permanent, applicable to Executive or by which Executive or any of his, her or its properties is bound or affected, and (D) result in the creation of, or require the creation of, any lien (statutory or otherwise), mortgage, deed of trust, pledge, security interest, easement or other similar encumbrance (excluding restrictions on transfer generally arising under federal and state securities laws) upon the Executive Units.

(iv)     No legal action, suit, arbitration or other legal, administrative or other governmental investigation, inquiry or proceeding (whether federal, state, local or foreign) is pending or, to the Executive's actual knowledge, threatened, against the Executive that, if adversely determined, is reasonably likely to impair or otherwise adversely affect the Executive's ability to perform his, her or its obligations under this Agreement or the LP Agreement.

(v)     The Executive is an "accredited investor" as that term is defined in Rule 501(a) of Regulation D under the Securities Act of 1933, as amended, and the rules and regulations in effect thereunder (the "Act"). The Executive considers itself to be an experienced and sophisticated investor and to have such knowledge and experience in financial and business matters as are necessary to evaluate the merits and risks of an investment in the Executive Units.

(vi)     The Executive is not a "bad actor", as that term is defined in paragraph (d) of Rule 506 of Act.

(vii)     The Executive's principal office or residence address is as set forth on the signature page hereof. The Executive agrees that it will notify the Partnership in writing if the address of the Executive's principal office or residence changes.

(viii)     The Executive hereby acknowledges and agrees that (A) there is no current public market for the Executive Units and none is expected to develop, and (B) as a result of such matters and other factors, the Executive Units are difficult to value. The Executive understands that the Executive Units acquired hereunder are a speculative investment which involves a high degree of risk of loss of the entire investment therein, that there will be substantial restrictions on the transferability of the Executive Units and that following the date hereof there will be no public market for the Executive Units and that, accordingly, it may not be possible for the Executive to sell or pledge the Executive Units, or any interest in the Executive Units, in case of emergency or otherwise.

(ix)     The Executive has been advised that the Executive Units have not been registered under the Act or any state securities laws and, therefore, the Executive Units cannot be sold unless they are registered under the Act and applicable state securities laws or unless an exemption from such registration requirements is available. The Executive is aware that the Partnership is not under any obligation to effect any such registration with respect to the Executive Units or to file for or comply with any exemption

from registration.

(x)    The Executive acknowledges that it has received, within a reasonable time prior to the sale, the LP Agreement.  The Executive has carefully reviewed the LP Agreement.  The Executive has been given the opportunity to obtain any information or documents, and to ask questions and receive answers about such documents, the Partnership and its Subsidiaries and, to the extent it has asked such questions or requested such information, the Partnership has answered such questions and supplied such information to the Executive's satisfaction.  The Executive has had the opportunity to consult his, her or its own independent legal, tax, accounting and other advisors with respect to the Executive's rights and obligations under this Agreement and the LP Agreement and the tax and other economic consequences to themselves of the acquisition, receipt or ownership of the Executive Units, including the tax consequences under federal, state, local, and other income tax laws of the United States or any other country and the possible effects of changes in such tax laws.  The Executive is not relying on the Partnership, its unitholders, members, managers or any Affiliate of any of the foregoing or any of their respective employees, agents, representatives, partners (whether limited or general) or advisors with respect to the legal, tax, economic and related considerations of an investment in the Executive Units.  The Executive is aware that the Executive may sell, transfer or otherwise dispose of the Executive Units only in a manner consistent with the terms and conditions set forth in this Agreement and the LP Agreement.

(xi)    The Executive understands and agrees that, except as explicitly set forth herein none of the Partnership, nor any Affiliate of the Partnership, has made or will make any representations and/or warranties, whether express or implied, with respect to the Partnership or any Subsidiary of the Partnership, and that only those representations and warranties contained in this Agreement, or any other agreement entered into by and between the Partnership and the Executive, shall have any legal effect.  The Executive:

(1)    is not tax-exempt under Section 501(a) of the Code;

(2)    is a U.S. person within the meaning of Section 7701(a)(30) of the Code for U.S. federal income tax purposes and will execute and furnish herewith an IRS Form W-9; and

(3)    is not (or if the Executive is a disregarded entity, its regarded owner is not) a partnership, grantor trust, or S-corporation (a "flow through entity"), in each case, for U.S. federal income tax purposes, or, if it (or if the Executive is a disregarded entity, its regarded owner) is a flow through entity or if the Executive is a disregarded entity and its regarded owner is a flow through entity, it is not a principal purpose of the Executive's participation in the Partnership to permit the Partnership to satisfy the 100 partner limitation contained in U.S. Treasury Regulations Section 1.7704-1(h)(1)(ii).

(xii)    The Executive represents and warrants that the information he, she or it has provided in this Agreement and, to his, her or its knowledge, in any U.S. Internal Revenue Service or other tax form delivered to the Partnership is true, accurate and complete and may be relied upon by the Partnership for any purpose, including the

DocuSign Envelope ID: A0D366AD-365F-4029-A7FF-AB84E9663C71

establishment of Executive-related facts underlying claims of exemption from the registration provisions of federal and state securities Laws.  The Executive acknowledges that the Partnership is relying on such information in connection with (a) the Executive being issued the Executive Units and being admitted as a Partner of the Partnership, (b) not registering the offer and sale of the Executive Units under the Act or any state securities Laws, (c) not registering the Partnership under the Investment Company Act and (d) the management of the Partnership's business.

## EXHIBIT C

## VESTING CONDITIONS

Certain capitalized terms used in this Exhibit C shall have the meanings assigned to such terms in clause (f) of this Exhibit C, and other capitalized terms used in this Exhibit C that are not otherwise defined herein or in the Agreement shall have the meanings assigned to such terms in the LP Agreement.

(a)    Time Vesting Units.  10% of the Time Vesting Units shall become vested on a semi-annual basis on each of the first ten (10) six-month anniversaries of the Grant Date, provided that on each applicable vesting date Executive is then employed by or performing services for the Partnership or its Affiliates.  There will be no proportionate or partial vesting prior to such vesting date and all vesting will occur only on such vesting date, subject to Executive's continued employment or other service with the Partnership or its Affiliates through such vesting date.

(b)    Exit Event Vesting Units.  The Exit Event Vesting Units shall be subject to performance vesting and shall become vested upon the occurrence of an Exit Event if and only if, as of such Exit Event (including any prior Exit Event or other liquidity or realization event upon which Qualifying Distributions are actually received by the CVC Partner on a cumulative basis), the CVC Partner achieves an aggregate Return on Invested Capital in accordance with the following schedule and Executive is then employed by or performing services for the Partnership or its Affiliates:

| CVC Partner Return on Invested Capital | Cumulative Vested Percentage of Exit Event Vesting Units |
|---|---|
| 2.0 | 20% |
| 2.25 | 40% |
| 2.5 | 60% |
| 2.75 | 80% |
| 3.0 | 100% |

There shall be no pro rata vesting or straight line interpolation for performance between the hurdles above, and all vesting will only occur on a "cliff" basis at the applicable performance level.  To the extent that the applicable Exit Event is an Initial Public Offering (including a SPAC Transaction), the foregoing Return on Invested Capital multiples may be (in the discretion of the Board) converted into the corresponding stock price targets tied to the publicly traded common stock of the IPO Entity (in each case as determined by the Board) in the manner reasonably determined by the Board.

(c)     <u>Accelerated Vesting</u>.

(i)     On and after an Initial Public Offering pursuant to which the Partnership acquires shares of common stock of the IPO Entity, immediately following any sale of shares of common stock of the IPO Entity by the Partnership, the following two items will be measured: (A) the Sold Percentage; and (B) the portion of the Time Vesting Units that have previously vested (the "<u>Executive Vested Percentage</u>"). To the extent that the Sold Percentage exceeds the Executive Vested Percentage, then the Executive Vested Percentage shall be increased to equal the Sold Percentage. The foregoing acceleration shall not, however, cause the Executive Vested Percentage to exceed the Sold Percentage.

(ii)     Following any accelerated vesting as provided in clause (c)(i) above, vesting of the Time Vesting Units shall cease until the date on which vesting of such Time Vesting Units (without taking into account any accelerated vesting under clause (c)(i) above) would result in a higher vested percentage. For the avoidance of doubt, the remaining unvested portion of the Time Vesting Units shall continue to vest as specified in clause (a) above. For example, and solely for illustrative purposes, if the Executive Vested Percentage was 40% and the Sold Percentage was 60%, the Executive Vested Percentage would increase to 60% under clause (c)(i) above, and the remaining unvested 40% of the Time Vesting Units would continue to vest at the times specified in clause (a) above in 10% installments commencing as of the first vesting date following the vesting date on which the Executive Vested Percentage would be 60% had no acceleration under clause (c)(i) been applicable, subject to potential additional acceleration as specified in this clause (c).

(iii)     Upon the consummation of a Change of Control, all of the unvested Time Vesting Units shall immediately vest if Executive is then employed by or providing services to the Partnership or its Affiliates.

(iv)     In addition, the Board may, in its sole discretion, vest any and/or all of the unvested Executive Units hereunder at such time or such other time or times and on such other conditions as the Board determines.

(d)     <u>Board Determinations</u>. The Board shall in its sole discretion (but in good faith) make all determinations necessary or appropriate to determine whether the Exit Event Vesting Units have vested. For purposes of measuring the level of achievement of the performance goal set forth in clause (b) hereof as of any applicable Exit Event, it shall be assumed that any CVC Investments retained by the CVC Partner immediately following the applicable Exit Event were disposed of for no value until such time as the CVC Partner receives cash proceeds in respect of such CVC Investments. All computations required hereunder shall be made on an iterative basis taking into account the vesting and payment of any entitlements under outstanding incentive equity awards of the Partnership and its Affiliates, such that, if the applicable performance goal is achieved, but, after the vesting and payment of any entitlements under outstanding incentive equity awards of the Partnership or any of its Affiliates resulting from such achievement, such performance goal would no longer be achieved, then such vesting shall not take effect. The Board's determinations shall be final, binding and conclusive upon all Persons.

(e)     Forfeitures.   All vesting of Executive Units shall cease immediately upon termination of Executive's service with the Partnership and its Affiliates for any reason, and all unvested Executive Units shall be automatically forfeited and cancelled for no value upon any such termination without any consideration being paid therefor and otherwise without any further action of the Partnership whatsoever.   Notwithstanding any of the otherwise applicable vesting conditions of this Exhibit C, the Executive Units shall always be subject to the repurchase and forfeiture provisions in Section 9.06 of the LP Agreement.   Subject to earlier termination and forfeiture as provided herein and in the LP Agreement, to the extent that any portion of the Executive Units do not become vested in accordance with the provisions of this Exhibit C, such unvested Executive Units shall be automatically forfeited and terminated as of the Wind-Up Date without any consideration being paid therefor and otherwise without any further action of any Person whatsoever.

(f)     Definitions.   For purposes of this Exhibit C, the following terms shall have the following meanings:

(i)     "Change of Control" means the first transaction or series of related transactions after the Grant Date with an Independent Third Party or group of Independent Third Parties pursuant to which such Independent Third Party or group of Independent Third Parties in the aggregate acquire(s), directly or indirectly, (I) Control of, and more than 50% of the Class A Units (or a successor Security to the extent the Class A Units are reclassified or exchanged for a new class of Security) of, the Partnership or (II) all or substantially all (which, without implying any reduction in the intended threshold of the foregoing, shall in no event be less than 75%) of the Partnership's and its Subsidiaries' assets determined on a consolidated basis, in each case so long as at least 50% of the proceeds received by the CVC Partner and its Affiliates consist of cash and cash equivalents; provided that an Initial Public Offering or any other public offering shall not constitute a Change of Control.

(ii)     "CVC Investments" means the CVC Partner's (and its Affiliates') aggregate cash investment, directly or indirectly, into the Partnership and the Units in the Partnership received directly or indirectly by the CVC Partner and its Affiliates in return therefor (net of dilution for options, warrants, profits interest, incentive units, "promote" and other equity securities of the Partnership); provided that in the event that a Non-Exit Event occurs, the Partnership (acting pursuant to the Board) shall exclude the Units Transferred and the associated cash investment by the CVC Partner pursuant to such Non-Exit Event from the calculation of "CVC Investments."

(iii)     "Exit Event" means the consummation of a Change of Control or an Initial Public Offering in respect of which the Partnership is the IPO Entity, or the occurrence of the Wind-Up Date.   Notwithstanding the foregoing, upon the occurrence of an Initial Public Offering in respect of which an Affiliate of the Partnership in which the Partnership continues to own equity securities is the IPO Entity, if the Exit Event Vesting Units are not or do not become fully vested at such time, then each subsequent distribution by the Partnership to the CVC Partner of the cash proceeds from the sale by the Partnership of the equity securities of the IPO Entity shall also be considered an Exit Event.

(iv)    "Independent Third Party" means any Person who, immediately prior to the contemplated transaction, does not directly or indirectly beneficially or of record own 10% or more of the Equity Interests of the Partnership, and who is not an Affiliate of any such 10% owner or of the Partnership.

(v)    "Non-Exit Event" means the Transfer by the CVC Partner of Units in the Partnership (I) pursuant to the last sentence of Section 9.02(a) of the LP Agreement and/or (II) pursuant to (or by receiving the CVC Partner's ratable portion of the proceeds of) a Strategic Transaction.

(vi)    "Qualifying Distribution" means, with respect to the CVC Investments, without duplication, all cash proceeds actually received by the CVC Partner on a sale of all or any portion thereof and all distributions of cash made by the Partnership to the CVC Partner with respect to the Units received by the CVC Partner in exchange for the CVC Investment (in each case net of dilution for options, warrants, profits interests, "promote" or other equity securities or phantom interests in the Partnership), other than any monitoring fees, professional service fees, capital contribution fees, management fees, advisory fees, closing fees, director fees, expense reimbursements, indemnification payments, tax distributions or any other fees paid to any of the CVC Partner, any of its equityholders or any of its Affiliates.  In the event that any non-cash proceeds are received by the CVC Partner in respect of the CVC Investment, such non-cash proceeds shall not be treated as "Qualifying Distributions" until cash proceeds are received by the CVC Partner in respect of such non-cash proceeds (and the amount of such Qualifying Distribution shall equal the amount of cash proceeds so received); provided that, notwithstanding anything to the contrary, any cash or other consideration otherwise received or receivable (including in respect of Contingent Amounts (as defined below)) in respect of any Units excluded from the calculation of "CVC Investments" pursuant to the proviso in the definition of "CVC Investments" shall not be included in the calculation of "Qualifying Distribution." Notwithstanding anything to the contrary and for the avoidance of doubt, any amounts received by any aggregator or other investment vehicle shall not be deemed to have been received by the CVC Partner except to the extent such amounts are actually paid to the actual "CVC"-branded private equity funds investing indirectly through such aggregators and investment vehicles in respect of the CVC Partner.  In the event that any consideration received in connection with an Exit Event is subject to escrow arrangements or indemnity holdbacks, or takes the form of promissory notes, securities, earn-outs, deferred consideration or other contingent amounts as well as any portion of the CVC Investments that are retained by the CVC Partner (collectively, "Contingent Amounts"), such Contingent Amounts shall only be taken into account as "Qualifying Distributions" to the extent that the CVC Partner receives cash in respect of such Qualifying Distributions.  At the time that the proceeds from any Contingent Amounts are paid in cash to the CVC Partner, the Board will re-compute the amount of Qualifying Distributions at such time, and if such re-computation should result in any additional vesting in respect of the Executive Units hereunder (as calculated on an iterative basis), the relevant Exit Event Vesting Units shall be vested to the extent such cash had been received by the CVC Partner at the time of the applicable Exit Event.  In the event that an Initial Public Offering occurs, and the CVC Partner receives securities of the IPO Entity upon or after such Initial Public Offering, then in the sole discretion of the Board, the CVC Partner may be deemed to have received a Qualifying Distribution equal to the Fair Market Value of the securities of the IPO Entity received by the CVC Partner (whereupon in no event shall any cash or other consideration thereafter received in respect of such securities shall be deemed a Qualifying Distribution).

(vii)    "Return on Invested Capital" means, as of any date, the multiple of (I) all Qualifying Distributions as of such date (having accounted for the dilutive impact of the vesting of any equity-based awards, options, warrants, profits interest, "promote" and other equity securities of the Partnership) over (II) the CVC Investments.

(viii)    "Sold Percentage" means, at any time, an amount equal to (I) the aggregate number of shares of common stock of the IPO Entity sold by the Partnership on or after the date of the Initial Public Offering (but, for the avoidance of doubt, not including any primary issuances by the IPO Entity) (provided that, for the avoidance of doubt, the distribution of any shares by the Partnership pursuant to Section 9.11 of the LP Agreement shall not be considered to be a sale of such shares for purposes of this clause (I)), divided by (II) the aggregate number of shares of common stock of the IPO Entity held by the Partnership immediately prior to the Initial Public Offering.  The calculation of the Sold Percentage shall be subject to adjustment in the same manner as specified in Section 1(h) of the Agreement in the event a type of transaction described in such Section 1(h) occurs with respect to the IPO Entity.  A transaction involving the IPO Entity (including, without limitation, merger of the IPO Entity) where the CVC Partner or the Partnership receives cash or marketable securities (and, for the avoidance of doubt, marketable securities shall not include any securities that are not freely tradeable without restriction, provided such securities shall become marketable securities at such time as all such restrictions are removed or otherwise are no longer applicable) in connection with the transfer or redemption of shares of the IPO Entity shall constitute a "sale" of common shares by the CVC Partner or the Partnership for purposes of this definition.

(ix)    "Wind-Up Date" means the earlier of (I) the first date on which the CVC Partner and its Affiliates no longer directly or indirectly hold any limited partnership interests in the Partnership (or the Partnership no longer directly or indirectly holds any equity securities of Accord JV Corp. or the IPO Entity) or (II) the liquidation, dissolution or winding-up of the Partnership.

## JOINDER TO AMENDED AND RESTATED
## LIMITED PARTNERSHIP AGREEMENT OF ACCORD TOPCO LP

September 30, 2021

The undersigned is executing and delivering this joinder agreement pursuant to the Amended and Restated Limited Partnership Agreement of Accord Topco LP, dated as of July 26, 2021 (the "Partnership Agreement").  Capitalized terms used but not defined herein have the meanings given to them in the Partnership Agreement.

By executing and delivering this joinder agreement to the Partnership, the undersigned hereby agrees to the following:

The undersigned signatory, in order to become the owner or holder of Class B Units, by virtue of the issuance by the Partnership to such signatory and/or the transfer of Class B Units to such signatory, hereby agrees that by the undersigned's execution hereof during the undersigned's ownership of the Class B Units, the undersigned shall be a party to, bound by, and comply with the provisions of the Partnership Agreement as a Partner, Class B Partner, Limited Partner, Management Partner, Individual Partner, Additional Partner and/or Substitute Partner, as applicable, in each case, of the Partnership with respect to the Class B Units, in all cases subject to all of the rights, restrictions, conditions and obligations applicable to the Partner, Class B Partner, Limited Partner, Management Partner, Individual Partner, Additional Partner and/or Substitute Partner, as applicable, in respect of such Class B Units as set forth in the Partnership Agreement.  This joinder agreement shall take effect and shall become a part of the Partnership Agreement upon the effective date of the relevant issuance (i.e., the Grant Date) and/or transfer of Class B Units to the undersigned.

IN WITNESS WHEREOF, the undersigned has caused this joinder agreement to be signed as of the date written above.

_____

Clinton Squadroni

DocuSign Envelope ID: B07DFBD2-1CF3-40EF-8337-694B3AB85877

## <u>SPOUSAL CONSENT</u>

The undersigned spouse of Executive hereby acknowledges that I have read the foregoing Class B Unit Grant Agreement executed by Executive as of the date hereof and that I understand its contents. I am aware that the foregoing Class B Unit Grant Agreement, together with the Limited Partnership Agreement, dated as of September 30, of Accord Topco LP provides for the sale or repurchase of my spouse's Class B Units under certain circumstances and imposes other restrictions on such securities (including, without limitation, restrictions on transfer). I agree that my spouse's interest in these securities is subject to these restrictions and any interest that I may have in such securities shall be irrevocably bound by these agreements and further, that my community property interest, if any, shall be similarly bound by this instrument. In addition, the undersigned spouse hereby agrees to the terms and conditions, and to be bound by and subject to, the Spousal Consent attached as Exhibit B to the LP Agreement.

Spouse's Signature:_____

Print Name:_____Carlene Anne Squadroni_____

Dated: _____September 30, 2021_____

Executive's Name: _____Clinton Squadroni_____

D-1

# EXHIBIT D

# WORLDWIDE EXPRESS®

**VIA UPS and EMAIL (Clinton.Squadroni@gmail.com)**
Clinton Squadroni
1122 Aline Ct.
South Bend, Indiana 46614

March 23, 2023

Re:     *Restrictive Covenant*
        *Obligations, Notice Letter*

Mr. Squadroni:

I write on behalf of WWEX Franchise Holdings, LLC ("**WWEX**" or the "**Company**"), following your recent resignation from WWEX and discussion of your potential employment at InXpress, LLC and/or InXpress Global LTd. (collectively, "**InXpress**"),  a competitor.

This letter serves as a reminder that you entered into a Post-Employment Non-Competition Agreement with WWEX dated April 18, 2017 ("**PENCA**"), whereby you agreed, for a period of <u>twelve (12) months</u> following separation of your employment for any reason, not to:

> directly or indirectly, for yourself, or through, on behalf of, or in conjunction with any other person or entity, own, operate, maintain, engage in, have any interest in, be employed by or perform any service relating to parcel, freight, or other shipping services, where your duties are in whole or in part are substantially similar to or overlap with your duties for Company, either within the United States or elsewhere if relating to products or services offered in the United States, for any business which offers services or products that are the same as or substantially similar to services or products that were offered by Company [during your WWEX employment].

You likewise entered into a Confidentiality Agreement, Non-Solicitation Agreement, and Agreement Not to Compete During Employment with WWEX dated April 18, 2017 ("**Agreement**"), whereby you agreed , among other things, to preserve and protect, both during and at all times after your WWEX employment, WWEX's Confidential Information, as defined in the Agreement.  With respect to WWEX customers, you further agreed, for <u>twelve (12) months</u> following separation of your employment for any reason, not to:

> directly or indirectly, for yourself, or through, on behalf of, or in conjunction with any person or entity, solicit, entice or persuade, or attempt to solicit, entice or persuade, any customer, prospective customer, franchisee, prospective franchisee, carrier, or vendor from doing business with the Company, its affiliates, or any [WWEX] franchisee or to divert or attempt to divert any business, customer, or prospective customer of the Company, its affiliates, or any [WWEX] franchisee to any competitor or other person by inducement or otherwise.

Mr. Clinton Squadroni
Cease and Desist/Notice Letter
March 23, 2023
Page 2

With respect to WWEX employees and contractors, you likewise agreed, for <u>twelve (12) months</u> following separation of your employment for any reason, not to:

> directly or indirectly, for yourself, or through, on behalf of, or in conjunction with any person or entity, employ or engage as an independent contractor or seek to employ or engage as an independent contractor any person who, within the preceding 6 months, has been an employee or independent contractor of the Company, any of its affiliates, or any [WWEX] franchisee, or induce or seek to induce any person who is an employee or independent contractor of the Company, any affiliate of the Company, or any [WWEX] franchisee to leave his or her employment or terminate his or her independent contractor relationship.

Copies of the PENCA and Agreement are attached for your reference.

Please be advised of the seriousness of this situation; if you become employed by a competitor, including, without limitation, InXpress, WWEX will seek to vigorously protect its interests, including through injunctive relief to enforce the PENCA against both you and your future employer. Additionally, be advised that if you (or any employee or agent of InXpress, through you) use WWEX's confidential, proprietary and/or trade secret information for your benefit or the benefit of a competitor, you will be subject to additional legal claims and liability for, without limitation, conversion, misappropriation, misappropriation of trade secrets, and tortious interference with business relations.

WWEX is also aware that InXpress has solicited other WWEX employees. If WWEX determines that you facilitated and/or were involved in these solicitations, the Company will vigorously pursue all remedies available to it against you and InXpress including, without limitation, injunctive relief, monetary damages, and attorneys' fees and costs. WWEX expressly reserves all rights and remedies it may have against you and InXpress in connection with the above-described improper conduct.

**LITIGATION HOLD NOTICE**

You are hereby notified that you are required by law to preserve all documents, emails, electronic files, and other evidence relating to the allegations and activities referenced in this letter. This preservation demand includes, without limitation, all WWEX materials (in both electronic or hard copy form) in your and/or InXpress's possession, custody, or control, as well as all emails, texts, instant messages, and other evidence of communications between you or any other InXpress employee and WWEX employees, contractors, consultants, Customers, and Prospective Customers, as defined in the PENCA. Failure to do so may subject you to legal sanction under applicable law.

Mr. Clinton Squadroni
Cease and Desist/Notice Letter
March 23, 2023
Page 3

Please direct your communications regarding this matter to me for the immediate future.

Sincerely,

Justin H. Smith, Esq.
Associate General Counsel, L&E

Enclosures (2)

cc:     Charlene York, Chief Legal Officer
        Joel Clum, Chief Operating Officer
        Shelly Patman, Sr. VP of Human Resources

# EXHIBIT E

(/)                                                                                  (tel:801-495-7894)

## Your Promise.
## Our Business.

We care about your shipments because your promise is our business. That's why our team of experts finds the optimum shipping solution for every customer.

**Get a Quote**   **(https://us.inxpress.com/get-a-quote/)**

*Robert*
*InXpress Shipping Consultant*



### It's our business

Your promise is a personal commitment, and when you promise to deliver, InXpress can make it happen. With shipping solutions for international parcels and packages, LTL, FTL, heavy air freight, cross border E-Commerce and more, it's the business of InXpress and our team of shipping partners, to help you keep your promise.



**Locate an InXpress representative near you**

InXpress representatives are located across the United States and around  he globe to serve shipping customers everywhere.

**Your Nearest Location (https://us.inxpress.com/locations/)**



**Global Shipping Specialists**



p it all

n business documents and
els to pallets and crates.



hly competitive rates

e on all your shipping costs
our volume buying power.



rld class, personal
vice

ll find whatever you need.



commerce integration

mless integrations with major
pping carts expands cross
er sales.



e and secure

veries are acknowledged and
ed for.



national deliveries

to Europe, Australia, France,
a and more.

## Small Package International and Domestic Services

Great rates, a single point of contact and one invoice.

**Read more**    (/services/)

## Domestic and International Freight

InXpress LTL, FTL and Air Freight can move your goods across the country or around the globe.

**Read more**    (/services/)

## E-Commerce

Online sellers can increase cross border sales with our E-Commerce integrations.

**Read More**    (/services/)

## Full Service

With InXpress you get global shipments, online tracking and just one invoice.

**Read More**    (/services)

## One innovative platform for all your shipping needs

Looking to save your business money, time, and hassle when it comes to shipping? It's all in the technology. With InXpress Webship, our cut ing-edge platform, you can manage everything in one place. From bulk uploads for multiple shipments, to carrier price comparisons, you'll have access to everything you need to book orders, dispatch shipments and make your life easier.

Desktop, mobile or tablet, any device goes; our platform is just that simple. What's more, it can seamlessly integrate into your E-Commerce store or warehouse management system, so here's no disruption in service - just reliable shipping and happy customers.

And the best part. We make sure our people and our software do all the hard work, so you have time to focus on tasks that matter most. It's our promise, bet it's our business.

**<u>Your Webship+ Login</u>** **(http://uswebship.inxpress.com/imcs_us/login)**





Based on personal experience, 79% of customers would definitely recommend InXpress to a friend.

InXpress Global Customer Survey



### InXpress works with major world-class carriers













Global Home (https://www.inxpress.com/)          United States (/)

**Contact - Corporate Office**                              **Sitemap (/support/site-map/)**

**f** (https://www.facebook.com/inxpressamericas/)   **in** (https://www.linkedin.com/company/118046/)                    ©Copyright 2023

Cookies Settings

*In*

(/)

(tel:801-495-7894)

## International and Domestic Shipping Specialists

Industry-defining shipping solutions, delivered by experts who care.

Your Promise. Our Business.

**Get A Quote**      (/get-a-quote/)



### A global network for international shipping

InXpress is an international parcel, freight and shipping company who partners with the world's best carriers. Our size and tremendous volumes allow InXpress shipping specialists to provide customers unrivaled shipping solutions at some of the lowest prices anywhere.

Your business can enjoy first class shipping that's as effortless and affordable – no matter where you are, no matter what your needs. Your promise. Our business.



**One innovative online shipping platform**

Built on over 20 years of insight, we've pioneered world-class technology that's disrupting tradi ional shipping services around the globe. We've invested millions in our high performance platform to deliver a truly innovative shipping experience that's proven to save time and money.

Every 7.2 seconds, a small business somewhere makes a shipment through InXpress. We move over 4.3 million shipments annually. What's more, our online shipping platform and responsive customer service teams make sure your shipments arrive as promised. It's our business.



## Unparalleled customer service around the world

We're proud of our people. They drive our successful partnerships with world-class carriers, and are committed to finding the best possible shipping solution for each and every customer.

We genuinely care about your parcels as if  hey were our own, so you can be safe in the knowledge  hat we'll get them where they need to be, when they're meant to be there. You'll even have a dedicated local account manager, who'll be on hand to help wi h whatever you need. It's your promise but it's our business.



**Let us take care of the logistics**



**Save money with competitive rates**

Thanks to our global footprint and scale, we get access to some of the most exclusive shipping rates, which means you get huge savings.

**Find out more     (/services/)**

**Get great shipping services**

We only work with  he best and most established carriers to provide fast, reliable shipping for your business.

**Find out more     (/services/)**



*We provide exceptional local support to customers across the country.*

## From shipping emergencies to basic queries, we can help with it all.

**Find your nearest location (/locations/)**

**Franchise Opportunity**

Run a fully scalable, profitable start-up. As an InXpress franchisee, you can make your business dream a reality.

**Find out more** (/franchise-opportunities/)

Global Home (https://www.inxpress.com/)          United States (/)

**Contact - Corporate Office**                              **Sitemap (/support/site-map/)**

f (https://www.facebook.com/inxpressamericas/)   in (https://www.linkedin.com/company/118046/)          ©Copyright 2023

Cookies Settings

https://us.inxpress.com/about/

**InXpress** (/) (tel:801-495-7894)



**Shipping services with guaranteed savings**

Save money, time, hassle - we have a shipping service to suit every need. Saving, it's our business.

Get A Quote    (/get-a-quote/)

**The one-stop shipping solution for your business**

If you have a single shipment or process hundreds a day, we have a shipping solution for you. Whether it's international express, freight, or E-Commerce, we've got the global scale and leading software to get your shipment where it needs to be. It's our business.

Reliability is incredibly important, for your business and for your customers. It's even more crucial when you're dealing wi h high volumes, a wide range of goods and global deliveries. We've invested millions in webship+, our proprietary software platform so you have access to the right shipping solution for all your needs, all of  he time.



**Multiple carrier options - flexible shipping - great prices**

We understand that having options is important. That's why we work with multiple carriers around the world, so you can find one that meets your unique requirements. From international parcels to freight to E-Commerce support, we'll coordinate it all so you don't have to.



**DHL International Express**

As the number one reseller of DHL products in the US for the past nine years, and the fifth largest DHL customer in America, InXpress provides its customers the best rates and service available in the international small parcel industry.

DHL is the world's largest small parcel carrier with more than $57B in annual revenue. Using a fleet of over 250 aircraft, DHL transports urgent documents and goods reliably and on time to over 120,000 destinations in more than 220 countries and territories.

Our online system allows customers to process and schedule international shipments anytime, anywhere.

**<u>Your Webship+ Login</u> (http://uswebship.inxpress.com/imcs_us/login)**





**Freight**

In addi ion to express parcel shipments, InXpress specializes in LTL, FTL, heavy airfreight and ocean shipments. If you have freight it's our business to get it there. With our easy to use online Transportation Management Systems (TMS) you can select shipping options from over 50 carriers. Whether it's fast delivery, low price, special handling or just about any need, InXpress has the right shipping solution for every movement.



## E-Commerce

Are you achieving global reach for your E-Commerce business? Are you selling into lucrative world markets? InXpress is he largest worldwide reseller of DHL Express services for international parcels. People everywhere want your products, and our great rates and modern technology can help grow your cross border sales.

If you want help growing your business in new, cross border markets visit our E-Commerce Integration website and add DHL to your shopping cart.

**Visit Our E-Commerce App (https://www.inxpressapps.com)**



**Additional Service Partners**

We partner with a number of experts in the shipping industry to save you even more money, time, and hassle.

71lbs - audits FedEx and UPS shipments for on time delivery and refunds

Marsh Insurance - global cargo and freight insurance

Shipware - provides audit and contract negotiation services for large users of FedEx and UPS

**Contact Us for more information (https://us.inxpress.com/contact-us/)**



### Other benefits of being an InXpress Customer

InXpress can handle all your export and import shipping needs. And, we can prepare error free shipping documents to make customs clearance a breeze

Highly competitive rates from the most established carriers in the US and around the world

Personalized customer support from hundreds of InXpress dedicated account managers and global shipping partners

Third party insurance and shipment protection



*Sarah saves on her shipping costs by using InXpress*

## Ready to reap the rewards of super simple shipping?

**Get a quote today to see what we could do for you. (/get-a-quote/)**

Global Home (https://www.inxpress.com/)          United States (/)

**Contact - Corporate Office**                    **Sitemap (/support/site-map/)**

**f** (https://www.facebook.com/inxpressamericas/)   **in** (https://www.linkedin.com/company/118046/)          ©Copyright 2023

Cookies Settings

# EXHIBIT F

# SpencerStuart

www.spencerstuart.com

## Position and Candidate Specification



InXpress LLC

# Chief Executive Officer

**PREPARED BY:**
Bailey Hallingby
David MacEachern
Roxy Massar

December 2022
Assignment: 65101-002

Confidential: This document has been prepared for the exclusive use of the client named. Because it contains confidential information, its use should be controlled and limited to the executives concerned. This information is given in good faith and is believed to be correct but may require verification.

# About the Company

InXpress LLC

InXpress is a technology-enabled international parcel, freight, and delivery logistics services company serving SME customers through a proprietary software platform and global network of almost 500 franchises in 14 countries. Established in 1999, the company maintains relationships with tier-one parcel, air and freight carriers around the world, offering discounted rates to franchisees that form relationships with SME customers through its direct salesforce. The company also offers its SME customers and franchisees a differentiated technology and SaaS platform, enabling them to effectively manage customer service and customers to centrally manage their transportation and logistics requirements. InXpress built its online software platform, Webship+, on over 20 years of insight. Webship+'s easy-to-use software features include bespoke tailoring of best rates within their carrier network, a bulk upload tool to quickly manage multiple orders, and integration with all of the main ecommerce platforms.

In November 2020, Hudson Hill Capital ("Hudson Hill" or "HHC") announced that it acquired a majority stake in InXpress Holdings Ltd, in partnership with the company's senior management team. Under Hudson Hill's ownership, InXpress has maintained a strong growth trajectory, doubling EBITDA and ramping earnings significantly over the past two years. The company has continued to expand its franchise network, while also broadening its portfolio of service offerings. InXpress sees ongoing market opportunities both in the U.S. (40% of current revenue) and overseas, through both its existing franchise model as well as direct sales.

## KEY INXPRESS LLC FACTS
- Gross revenue of approximately $350 million
- Net revenue of approximately $40 million
- EBITDA of approximately $20 million
- Projected topline growth of 35-40% per year
- Over 500 franchisees globally
- 14 countries and over 30,000 customers globally
- Primary regions:  U.S., U.K., Australia, Canada
- Headquartered in South Jordan, Utah

For more information, visit www.inxpress.com

## HUDSON HILL CAPITAL

Hudson Hill Capital is a private investment firm founded by Eric Rosen, Alexander Stacy, and Jason Palmatary. Departing from the prevailing short-term orientation of the private equity industry, Hudson Hill Capital invests with entrepreneurs and management teams who are attracted to patient and committed capital partners. Hudson Hill invests its own capital alongside like-minded partners in attractive growth-oriented opportunities in industries benefiting from long-term secular growth tailwinds. HHC's industry focus includes business services, software and financial services sectors.

For more information, visit www.hudsonhillcapital.com

# Position Summary

InXpress LLC

The Chief Executive Officer (CEO) will have full profit-and-loss responsibility for the company, including overall commercial, operational and financial performance of the business. The CEO will be accountable for driving growth through the execution of a proven growth strategy within the transportation and logistics industry. The CEO will work closely with Hudson Hill, the board of directors, and the broader InXpress team to ensure that the operational strategy and execution capability are appropriately aligned. The CEO will oversee all key commercial, operating and staff areas of the company, and provide strong and visible direction to the organization at all levels. Additionally, the CEO will be responsible for driving sustainable, profitable organic growth, enhancing InXpress' penetration in its target markets to continue market share gains. Externally, the CEO will be the company's ambassador to various constituent groups, including franchisees, customers, service providers, and third-party suppliers.

The role is located at the company's headquarters in South Jordan, Utah, with relocation strongly preferred.

## KEY RELATIONSHIPS

**Reports to**        Board of Directors

**Direct reports**    Chief Executive Officer, Americas
                      Chief Executive Officer, EMEA
                      Chief Operating Officer
                      Chief Financial Officer
                      President, InXpress Canada
                      Sales and Business Development
                      Technology
                      Human Resources

**Other key**         Leadership Team
**relationships**     Franchisees
                      Customers
                      Carriers
                      Owners

## KEY RESPONSIBILITIES

- Provide inspiring and motivating leadership and management to the organization.
- Establish credibility with the senior leadership team and broader organization globally, maintaining full accountability for the commercial, operational and financial performance of the business.
- Develop and refine the company's global strategy to drive growth by leveraging innovation and technology to differentiate the business and lead strategic growth initiatives.
- Attract, build and motivate a high-performing management team. Redefine the InXpress culture to reflect a fast-paced, entrepreneurial environment that is focused on growth and performance while delivering an exceptional customer experience.

- Build a framework and infrastructure to cultivate operational integrity, while deploying advanced tools, systems, and processes to improve operational efficiency and effective customer service operations.
- Foster the growth and commercially oriented mindset of the organization. Identify opportunities for InXpress to expand offerings, either organically or through mergers and acquisitions.
- Continually monitor the effectiveness of internal and external processes and the preparation of accurate reports on the operating condition of the company.
- Work closely with the management team and board of directors on critical business matters such as continued technology evolution, mergers and acquisitions, the identification of new service opportunities and the exploitation of general opportunities for InXpress on a go forward basis.
- Work collaboratively and effectively in a cross-functional and cross-cultural manner, appreciating the global nature of the business and complexities of certain matrixed reporting lines.
- Align InXpress' support functions to foster the development and adoption of innovative and competitive services to create an environment for profitable growth.

## DESIRED OUTCOMES

Phase One:
- Create, implement, and embrace a culture of ownership and accountability across the company. Motivate, drive, and deliver on the best possible financial results in a high-growth environment.
- Develop and build a core infrastructure that can support the company's existing business, while positioning it for extensive ongoing growth. Utilize best-in-class technology, systems, tools, and processes to facilitate company-wide strandardization, best-practices, and enhanced shared services.
- Grow overall revenues with existing customers through exceptional service and new service offerings, while continuing to expand the company's franchise network.
- Improve operating performance and expand profit margins.

Phase Two:
- Leverage and enhance technology and infrastructure to create and capitalize on new business opportunities and strategic growth initiatives.
- Strengthen internal sales team and capabilities to create an increased focus on direct sales, complementing InXpress' existing franchise business model.
- Explore investment and capital deployment opportunities around potential business acquisitions, including certain strategic franchisees.
- Maintain an environment and culture that provides employees with the authority, accountability, training, information and resources to achieve their full potential and successfully drive InXpress' performance.
- Continue to build an organization capable of scaling at a rapid pace while maintaining operational performance and an industry-leading customer experience.

# Candidate Profile

InXpress LLC

InXpress is seeking a highly accomplished executive to serve as its next Chief Executive Officer, leading the company towards accelerated growth and continue the business transformation. The ideal candidate has demonstrated their ability to turn vision into a coherent strategy by ensuring the business strategy enables the revenue model, prioritizing business opportunities, reallocating resources and driving operational excellence. The successful CEO will ideally have a strong background in transportation and third-party logistics, as well as tech-enabled services, having successfully led a company of similar scale and complexity. The ideal candidate will bring a solid understanding of the logistics ecosystem and how technology is both shaping and the industry. Prior experience operating in a franchise business model is beneficial but not a requirement.

The CEO will have a proven track record of being an inspirational leader that can transform a company culture to be collaborative, accountable, and data driven, focused on performance excellence. This individual will be an effective and transparent communicator that can collaborate and partner with customers, the board of directors, and the executive team to drive results and to strengthen the company brand and market position.

## IDEAL EXPERIENCE

### 15+ years of leadership experience in third-party logistics
A proven and well-rounded leader with extensive experience leading and scaling a reputable third-party logistics services provider, ideally with a tech-enabled and franchise or agent-based business model. Prior CEO experience is preferred; P&L experience with equal or greater scale and complexity as a President, COO or equivalent is required.

### Transformation experience
A track record of transforming a business and culture by creating and implementing the requisite infrastructure, systems, tools, and best practices. Prior experience driving cultural change and enhancements, resulting in performance improvements, greater operating efficiencies, organic growth and margin expansion.

### Growth and development
Has played a key leadership role in successfully growing a services and solutions-oriented business through strategy deployment, service development and architecting templates for growth. Success in driving operational improvements, top-line growth, measurable profitability improvement and cash flow enhancements. Previous M&A and/or integration experience is preferred.

### Culture and team building
Proven ability to attract, develop, motivate, retain and lead a high-performing team of professionals. Success creating a highly energetic, collaborative, and entrepreneurial culture that embraces performance, rigor and accountability. Thrives in a fast-paced, results-driven environment. Prior private equity experience is preferred but is not a requirement.

## CRITICAL LEADERSHIP CAPABILITIES

### Acting Strategically

- Creates a 2-3-year roadmap or blueprint to implement the enterprise strategy
- Identifies and prioritizes the most critical future factors to consider in making decisions
- Makes plans to address changes or trends in the external landscape (i.e., competitors, customers, and market segments) that affect the business
- Develops plans that consider the impact beyond own area, location, function, or market

### Leading Change

- Takes personal ownership for advancing significant change
- Communicates a new direction or change with a clear rationale and/or sense of urgency
- Creates or takes advantage of multiple opportunities to promote needed change
- Adapts communication content, approach or style around change to appeal to different audiences

### Driving Results

- Acts to surpass team goals, seizing opportunities to extend the limits of what is possible
- Sets continually higher goals for the team that are ambitious but achievable
- Identifies and acts on new opportunities that enable performance targets to be exceeded
- Seeks new challenges and is energized by exceeding targets

## OTHER PERSONAL CHARACTERISTICS

- Strong executive presence and gravitas, combined with a high level of EQ.
- Entrepreneurial with a demonstrated ability to lead and grow a company.
- A person of unquestionable integrity, moral character and ethics; trustworthy and sincere.
- A competitive spirit with a positive, winning attitude and drive for success; committed to excellence.
- An individual who demonstrates respect for all levels of employees. A collaborative and inclusive leader.
- Highly motivated, flexible and able to adapt to changing priorities.

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system.
The filer served this document via email generated by the efiling system
on the date and to the persons listed below. The rules governing
certificates of service have not changed. Filers must still provide a
certificate of service that complies with all applicable rules.

Tiffany Noullet on behalf of Richard A. Sayles
Bar No. 17697500
tnoullet@bradley.com
Envelope ID: 74630646
Filing Code Description: Original Petition
Filing Description:
Status as of 4/13/2023 5:25 PM CST

Associated Case Party: WWEX FRANCHISE HOLDINGS, LLC

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Dick Sayles | | dsayles@bradley.com | 4/13/2023 4:08:28 PM | SENT |
| Dennis L.Daniels | | dldaniels@bradley.com | 4/13/2023 4:08:28 PM | SENT |
| Lauren Green | | lagreen@bradley.com | 4/13/2023 4:08:28 PM | SENT |
| Tiffany Noullet | | tnoullet@bradley.com | 4/13/2023 4:08:28 PM | SENT |